**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL HUGHES, KRISTINE ZITNY, KATHLEEN ALEXANDER, individually and for the estate of MICHAEL HUGHES, PATRICIA HUGHES, PATRICIA GOINS, PAUL GOINS III, JANICE CARUSO, DANA RAINEY individually and for the estate of Paul Goins Jr., EMMITT BURNS, HELENA DAVIS, C.D. by and through his next friend Helena Davis, MARY SMEDINGHOFF, THOMAS SMEDINGHOFF, individually and for the estate of ANNE SMEDINGHOFF, REGINA SMEDINGHOFF, JOAN SMEDINGHOFF, MARK SMEDINGHOFF, MIRANDA LANDRUM, individually and for the estate of BRANDON LANDRUM, G.L. by and through his next friend Miranda Landrum, B.L. by and through her next friend Miranda Landrum, JANET LANDRUM, JAMES LANDRUM, TRACEY PRESCOTT, JOSEPH PRESCOTT, JACOB PRESCOTT, AARON PRESCOTT, individually and for the estate of BRANDON PRESCOTT, JOSHUA PRESCOTT, CHRISTINE PHILLIPS, individually and for the estate of FRANCIS PHILLIPS IV, S.P. by and through her next friend Christine Phillips, MARIA CARDOZA, RAMIRO CARDOZA SR., RAMIRO CARDOZA JR., individually and for the estate of KEVIN CARDOZA, CHET MURACH, individually and for the estate of THOMAS MURACH, WILLIAM MURACH, SAMANTHA MCNAMARA, BRENDA DAEHLING, KIRK DAEHLING, individually and for the estate of MITCHELL DAEHLING, ADAM DAEHLING, KAYLA DAEHLING, JOANNA GILBERT, individually and for the estate of WILLIAM GILBERT, JESSICA BENSON, LIESELOTTE ROLDAN, MATTHIAS ROLDAN, ANGEL ROLDAN, SAMANTHA ROLDAN, CHAPMAN GOOD for the estate of ANGEL ROLDAN JR., NANCY MULLEN, individually and for the estate of SEAN MULLEN, MIRIAM MULLEN, WILLIAM MULLEN, JOELLE ELLIS, JOHN ELLIS, JAMES ELLIS, BRANDON KORONA, MICHELLE ZIMMERMAN, CHRIS ZIMMERMAN, BAILY ZIMMERMAN, LORRIA WELCH, BARRY WELCH, individually and for the estate of NICKOLAS WELCH, ZACKARY WELCH, BRUCE NICHOLS, individually and for the estate of | JURY TRIAL DEMANDED<br><br><br>Case No.: 23-cv-6481 |

ROB NICHOLS, JEANNE NICHOLS, MOLLY
NICHOLS, TAMMY OLMSTEAD, WILLIAM M.
BURLEY, DAN OLMSTEAD, MICHAEL COLLINS,
MARTHA SMITH, individually and for the estate of
JAMES WICKLIFF CHACIN, THOMAS WICKLIFF,
MICHELLE ROTELLI, SHEILA LONG, NANCY
WILSON, individually and for the estate of CODY
PATTERSON, KAPRIEL WILSON, MARA WILSON,
ASHLEY GERDING, individually and for the estate of
JOSEPH PETERS, G.P. by and through his next friend
Ashley Gerding, DEBORAH PETERS, DENNIS
PETERS, MICHAEL DONIOS, ESTA SMITH, JOE
TORIAN, NATHAN TORIAN, individually and for the
estate of AARON TORIAN, EMILY TORIAN, JIMMY
SMITH, JOSEPH JONES JR., ALBERTO DIAZ,
KAYLA DIAZ, N.J.A.D. by and through his next friend
Kayla Diaz, N.J.D. by and through her next friend Kayla
Diaz, FRANCES DIAZ, MAXIMO DIAZ, ANTHONY
DIAZ, MATTHEW DIAZ, MICHELLE RILEY,
RODNEY RILEY, individually and for the estate of
JOSEPH RILEY, JULIE MARTIN, BRIAN MARTIN,
individually and for the estate of WYATT MARTIN,
CATHERINE MARTIN, ELIZABETH MARTIN,
KELLI-JO DODGE, individually and for the estate of
COREY DODGE, B.D. by and through his next friend
Kelli-Jo Dodge, P.D. by and through her next friend
Kelli-Jo Dodge, KATHLEEN MCEVOY, individually
and for the estate of RICHARD MCEVOY, PATRICK
MCEVOY, MICHELLE MCEVOY, JANICE
PROCTOR, LUANN VARNEY, SUMMER SUTTON,
individually and for the estate of BARRY SUTTON,
ERIN GOSS, HARRIET SUTTON, WENDY SHEDD,
TRECIA HOOD, FREDDIE SUTTON, ANNIE
MCBRIDE, CHESTER MCBRIDE SR.,
ALEXANDRA MCCLINTOCK, D.M. by and through
his next friend Alexandra McClintock, JOYCE
PAULSEN, GEORGE MCCLINTOCK III, KEVIN
KING, STEPHANIE MILLER, ANNGEL NORKIST,
WILLIAM NEWNHAM, HART NORKIST, AUJZA
NORKIST, NICOLE KAMALESON, CEDRIC
KAMALESON, BARCLAY KAMALESON, CADE
KAMALESON, SUNDERRAJ KAMALESON, and
MATTHEW SCHRIER

Plaintiffs,

v.

REZA ZARRAB and
TÜRKIYE HALK BANKASI A.Ş., a/k/a
"HALKBANK,"

Defendants.

## COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT

Tejinder Singh (TS0613)
Adam J. Goldstein (AG0318)
Sparacino PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

THE PARTIES AND OTHER RELEVANT ACTORS ........................................... 2

I.     PLAINTIFFS .......................................................................................... 2

II.    DEFENDANTS ....................................................................................... 2

   A.    Reza Zarrab ................................................................................ 2

   B.    Halkbank .................................................................................... 3

III.   IMPORTANT NON-PARTIES ............................................................... 3

   A.    The Islamic Revolutionary Guard Corps ..................................... 3

   B.    The IRGC's Front: the National Iranian Oil Company ................. 13

   C.    The IRGC's Terrorist Proxies in Afghanistan: the al-Qaeda Syndicate ................... 14

   D.    The IRGC's Terrorist Proxies in Iraq and Syria: al-Qaeda, al-Qaeda-in-Iraq, and al-Nusra Front ........................................... 20

JURISDICTION AND VENUE ........................................................................... 22

FACTUAL ALLEGATIONS ............................................................................... 23

I.     DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL UNLAWFUL ASSISTANCE TO THE IRGC AND ITS TERRORIST PROXIES PURSUANT TO AN AGREEMENT TO ASSIST THE IRGC IN PURSUING ITS FOREIGN POLICY AGENDA ................................................................................ 23

   A.    By 2012, U.S. Anti-Terrorism Sanctions Effectively Froze the National Iranian Oil Company's Assets in Türkiye, Depriving the IRGC of Billions of Dollars in Revenue ...................................................... 23

   B.    Defendants Helped the National Iranian Oil Company, a Known IRGC Front, Evade U.S. Anti-Terrorism Sanctions to Launder Over $20 Billion in Frozen Assets ................................................................ 33

   C.    At All Relevant Times, the National Iranian Oil Company Was a Known Front for the IRGC, Which Used and Uses Oil Revenue to Promote Terrorism ................. 42

   D.    The IRGC Used the National Iranian Oil Company's Assets to Sponsor Terrorist Attacks on Americans Through Proxies in Afghanistan and Syria ............ 49

II.    DEFENDANTS WERE GENERALLY AWARE THAT THEY WERE PLAYING A ROLE IN ILLEGAL ACTIVITY THAT FORESEEABLY RISKED TERRORISM ..................................................................................... 53

   A.    Defendants Knew That They Were Playing a Role in Illegal Activity, and Willingly Joined the IRGC's Conspiracy ................................... 53

   B.    The Illegal Activity Defendants Participated in Foreseeably Risked Terrorist Attacks on Americans ................................................................ 57

III.    DEFENDANTS KNOWINGLY AND SUBSTANTIALLY ASSISTED
TERRORIST ATTACKS ....................................................................... 60

IV.    PLAINTIFFS' CLAIMS ARE TIMELY ................................................. 66

V.    THE IRGC'S TERRORIST PROXIES COMMITTED, PLANNED, AND
AUTHORIZED THE ATTACKS THAT KILLED AND INJURED PLAINTIFFS
IN AFGHANISTAN ................................................................................ 68

    A.    February 10, 2014 Suicide Attack in Kabul (Michael Hughes and Paul Goins
Jr. Families)............................................................................................ 69

    B.    February 22, 2013 IED Attack in Helmand (Jonathan Davis Family) ...... 71

    C.    April 6, 2013 Suicide Attack in Zabul (Anne Smedinghoff Family) ........ 72

    D.    May 4, 2013 IED Attack in Kandahar (Brandon Landrum, Brandon Prescott,
Francis Phillips IV, Kevin Cardoza, and Thomas Murach Families)........ 74

    E.    May 14, 2013 IED Attack in Kandahar (Mitchell Daehling, William Gilbert
Families) ................................................................................................ 78

    F.    May 16, 2013 Suicide Attack in Kabul (Angel Roldan Jr. Family) .......... 80

    G.    June 2, 2013 IED Attack in Nimruz (Sean Mullen Family) ..................... 81

    H.    June 18, 2013 Rocket Attack in Parwan (Robert Ellis Family).................. 82

    I.    June 23, 2013 IED Attack in Paktika (Brandon Korona) ......................... 83

    J.    July 15, 2013 Recoilless Rifle Attack in Paktia (Sonny Zimmerman Family).......... 84

    K.    July 23, 2013 IED Attack in Wardak (Nickolas S. Welch and Rob L. Nichols
Families) ................................................................................................ 85

    L.    July 30, 2013 Indirect Fire Attack in Logar (Nicholas Burley Family)..................... 87

    M.    August 12, 2013 IED Attack in Logar (James Wickliff Chacin Family) .................. 88

    N.    August 20, 2013 Small Arms Attack in Wardak (George Bannar Jr. Family) ........... 90

    O.    October 5, 2013 IED Attack in Kandahar (Cody Patterson and Joseph Peters
Families) ................................................................................................ 91

    P.    January 20, 2014 Small Arms Attack in Kandahar (Edward Balli)............................ 92

    Q.    February 15, 2014 Complex Attack In Helmand Province (Aaron Torian
Family)................................................................................................... 93

    R.    June 2, 2014 Small Arms Fire Attack in Nangarhar (Jason Jones Family) ............... 95

    S.    August 12, 2014 IED Attack in Kandahar (Alberto Diaz Family) ............................ 95

    T.    November 24, 2014 IED Attack in Kabul (Joseph Riley Family).............................. 97

    U.    December 12, 2014 IED Attack in Parwan (Wyatt Martin Family).......................... 98

    V.    August 22, 2015 Suicide Attack in Kabul (Corey Dodge, Richard McEvoy, and
Barry Sutton Families)............................................................................ 99

    W.    December 21, 2015 Suicide Attack in Parwan (Chester McBride III Family)......... 101

X.      January 5, 2016 Complex Attack in Helmand (Matthew McClintock Family)........ 102

Y.      August 7, 2016 Kidnapping, Subsequent Hostage Taking, And Torture in Kabul and Pakistan (Kevin King Family).................................................................. 104

Z.      July 3, 2017 Indirect Fire Attack in Helmand (Hansen Kirkpatrick Family) ........... 105

AA.    January 14, 2019 Suicide Attack in Kabul (Manoharan Kamaleson Family) .......... 106

VI.   THE IRGC'S TERRORIST PROXIES COMMITTED, PLANNED, AND AUTHORIZED THE ATTACK THAT INJURED PLAINTIFF MATTHEW SCHRIER IN SYRIA ............................................................................................... 107

CLAIMS FOR RELIEF ............................................................................................................ 108

COUNT ONE: AIDING AND ABETTING UNDER THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) ................................................................................. 108

COUNT TWO: CONSPIRACY UNDER THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) ................................................................................. 110

JURY DEMAND ....................................................................................................................... 112

PRAYER FOR RELIEF ........................................................................................................... 112

## INTRODUCTION

1.    This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18

U.S.C. § 2333, and specifically the aiding-and-abetting and conspiracy causes of action created

by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat.

852 (2016). As Congress explained when enacting JASTA, this statute seeks "to provide civil

litigants with the broadest possible basis, consistent with the Constitution of the United States, to

seek relief against persons, entities, and foreign countries, wherever acting and wherever they

may be found, that have provided material support, directly or indirectly, to foreign organizations

or persons that engage in terrorist activities against the United States." JASTA § 2(b).

2.    Plaintiffs are American service members and civilians, and their families, who

were killed or wounded in terrorist attacks committed, planned, or authorized by al-Qaeda, often

in conjunction with the Taliban, including its Haqqani Network. Al-Qaeda, inclusive of its

branches and affiliates, directly participated in the attacks against Plaintiffs that occurred in

Afghanistan from 2012 to 2020, and in Syria from 2012 to 2013.

3.    Plaintiffs seek to hold Reza Zarrab and Türkiye Halk Bankasi A.Ş. ("Halkbank")

accountable for aiding and abetting the terrorists' attacks, and for joining a conspiracy that

included the attacks. From 2012 until 2016, Zarrab and Halkbank systematically helped the

National Iranian Oil Company ("NIOC") and its affiliates—which were known fronts for the

Islamic Revolutionary Guard Corps ("IRGC")—finance terrorist operations by evading anti-

terrorism sanctions that prevented the IRGC from accessing the proceeds of Iranian oil sales.

Through a prolonged campaign of deception, Zarrab and Halkbank helped IRGC fronts obtain

and deploy at least $20 billion—and by some estimates, as much as $100 billion—while the

IRGC was providing critical financial and logistical support to anti-American terrorists

worldwide. Defendants thus enabled the IRGC to supply money, weapons, training, technology,

1

and safe haven to terrorists in Afghanistan, Iraq, and Syria, which used that support to attack Americans. Defendants' conduct is actionable under JASTA.

## THE PARTIES AND OTHER RELEVANT ACTORS

### I.    PLAINTIFFS

4.    Plaintiffs are 151 individuals comprising direct and indirect victims of 27 terrorist attacks committed in Afghanistan from 2012 to 2020, and one attack in Syria from 2012 to 2013. In this terminology, direct attack victims are those who were physically present and were injured or killed in the attack. They include American service members and civilians who were in Afghanistan to support the United States' mission to curb terrorism and assist the Afghan government, as well as an American who was kidnapped and tortured in Syria. Indirect attack victims are the direct attack victims' close family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct attack victims.

5.    Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[1]

### II.    DEFENDANTS

### A.    Reza Zarrab

6.    Reza Zarrab is an Iranian national who previously resided in Türkiye and is currently believed to be in federal custody at an undisclosed location.

---

[1] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

7.      In March 2016, Zarrab was indicted for his role in the misconduct alleged herein. In 2017, Zarrab pleaded guilty to seven violations relating to anti-terrorism sanctions, bank fraud, money laundering, and bribery. In connection with his plea, Zarrab agreed to testify in the government's case against Halkbank executive Mehmet Hakan Atilla, and in the government's separate case against Halkbank. His sentencing is delayed pending those trials.

**B.      Halkbank**

8.      Halkbank is a foreign financial institution headquartered in Türkiye. The majority of its share capital is owned by the Türkiye Wealth Fund, a sovereign wealth fund founded in August 2016 owned by the Government of Türkiye. Prior to that date, the majority of Halkbank's share capital was held by the Turkish Privatization Administration.

9.      In October 2019, a grand jury returned a six-count indictment charging Halkbank with fraud, money laundering, and sanctions offenses relating to the misconduct alleged in this complaint. That criminal case remains ongoing.

10.     Halkbank's deputy general manager, Mehmet Hakan Atilla, was convicted by a jury in January 2018 for his role in the misconduct alleged in this complaint. The allegations against Atilla relate to conduct he performed in the scope of his employment at Halkbank. Other Halkbank executives also named in this complaint were indicted in the same case, but remain fugitives.

**III.     IMPORTANT NON-PARTIES**

11.     Plaintiffs bring claims for aiding and abetting terrorist attacks, and joining a conspiracy that included them. These are the groups Defendants assisted and conspired with.

**A.      The Islamic Revolutionary Guard Corps**

12.     In 1979, Ayatollah Khomeini created the IRGC to serve as a transnational terrorist organization that would support the Islamic Revolution. The IRGC was always a

3

transnational terrorist organization: it did not support the government of Iran – it supported the Islamic Revolution. For example, in 1985, IRGC co-founder Mohsen Rafiqdoost publicly stated: "[t]he IRGC was not created to defend the country's borders but rather the main aim for the creation of the IRGC was to defend the Islamic revolution."

13.    Under Iran's constitution, as interpreted by the Ayatollah and the IRGC, the IRGC interprets its sole responsibility for protecting and exporting the Islamic Revolution as the IRGC's specific responsibility to sponsor terrorist attacks targeting the United States, which the IRGC always understood to be the top threat to the Islamic Revolution.[2]

---

[2] *See*, *e.g.*, International Institute for Strategic Studies (IISS), *Iran's Networks of Influence in the Middle East* 16 (Routledge 2020) ("Article 150 of Iran's constitution mandated vaguely that the IRGC protect the nascent revolution and its future achievements. As a force orientated to the socio-political values of the revolution's leadership, the IRGC was also tasked to support liberation movements and oppressed Muslims abroad."); National Council of Resistance of Iran - U.S. Representative Office, *Terrorist Training Camps in Iran: How Islamic Revolutionary Guards Corps Trains Foreign Fighters to Export Terrorism* 2 (NCRI June 20, 2017) ("Article 151 of the Iranian regime's Constitution specifies the duties of the [IRGC] as 'protecting the Revolution and its accomplishments.' To put it another way, the IRGC is the backbone of the apparatus established to preserve the dictatorship, which itself rests on … export of terrorism and fundamentalism beyond Iran's borders … The Revolutionary Guards is involved in … terrorist interference in several countries of the region. Within the borders of Iran's neighbors, extensive terrorist operations and military meddling are carried out simultaneously. The IRGC also organizes terrorist networks and conducts terrorist operations throughout the world."); Ilan Berman, *Iran's Deadly Ambition: The Islamic Republic's Quest For Global Power* 13 (2015) ("Iran's new clerical rulers believed fervently that their government marked the start of a global caliphate and that Iran's revolution would augur the dominance of Islam 'in all the countries of the world.' Accordingly, the country's constitution proclaimed that the [IRGC] 'will be responsible not only for guarding and preserving the frontiers of the country, but also for fulfilling the ideological mission of jihad in God's way; that is, extending the sovereignty of God's law throughout the world.' Iran's radical vision of Islamic governance, in other words, was intended from the start to be an export commodity. During the tumultuous decade of the 1980s, as Khomeini's revolutionaries consolidated power at home, the principle of 'exporting the revolution' became a cardinal regime priority. Its importance was demonstrated in the fact that, despite the expense of a bloody, grinding eight-year war with Saddam Hussein's Iraq, the fledgling Islamic Republic sunk colossal resources into becoming a hub of 'global resistance.'"); *id.* at 20 ("the IRGC-QF has been dedicated to a singular aim since its formation in 1990: carrying out the 'extra-regional operations of the Islamic Revolutionary Guard Corps.' In other

14.     Because the IRGC's only obligation was to protect the Islamic Revolution, the
IRGC was structured to operate as a transnational terrorist organization to support the Islamic
Revolution both while the IRGC and its allies controlled the Government and, importantly, if the
Ayatollah and IRGC ever lost control of Iran's government, to operate as a global terrorist group
armed with the IRGC's pre-existing transnational infrastructure purpose-built to ensure the
IRGC could mount a terrorist campaign to retake Iran. As an IRGC scholar observed:

> [T]he IRGC was tasked with defending the revolution … Khomeini and his circle
> of senior advisers expected and feared an imminent U.S.-led military coup…. As
> the IRGC became the guardian of the Islamic Revolution, its political directorate
> began organizing an extraterritorial branch, the predecessor of today's Quds
> Force. Its mission was to guide revolution in the region, as Khomeini had wanted
> all along.[3] …

> [T]he founders of the Islamic Republic intended to create a revolutionary
> movement that was not about just Iran but the entire region. Four decades later,
> the Quds Force has become the embodiment of that doctrine.[4] …

> And what if the government in Tehran falls? … the Quds Force is organized to
> outlast the Islamic Republic. Its funding will be provided, albeit partially, but the
> business enterprises it has created in the region. It will probably have tens of
> thousands of the most committed militants still under its command. It will have
> access to arms caches it has stored across the region.[5]

---

words, the IRGC-QF is the vanguard of terrorism and insurgency in the name of the Islamic
Republic. … The Quds Force is, quite simply, the purest expression of the Islamic Republic's
belief that it 'plays a key role in world affairs as the standard bearer of revolutionary Islam and
the guardian of oppressed Muslims (and even non-Muslims) everywhere.'").

[3] Nader Uskowi, *Temperature Rising: Iran's Revolutionary Guards and Wars in the Middle East*, at xiv (2018).

[4] *Id.* at 164.

[5] *Id.* at 178.

15.     IRGC members directly swore allegiance to the Ayatollah, not to the Iranian

government, and was therefore "solely controlled and commanded by Vali-e-Faqih," i.e., the

Ayatollah's sole rule, which "ma[de the] IRGC … strongly akin to ISIS."[6]

16.     Nobody ever actually "retires" from the IRGC. Instead, IRGC officials who

"retire" are typically simply moved from uniform-wearing positions into ostensibly civilian-

facing roles that serve as fronts for key IRGC operations, including fundraising and logistics. For

example, according to an analysis of the IRGC published by NATO:

> The IRGC acts as a business fraternity within which members of the Guard can
> progress along a prescribed career path. Following active service, IRGC members
> are offered senior positions in state-affiliated [] organisations and [] networks …
> Accordingly, 'no one ever leaves the IRGC'; its senior officers are viewed as an
> Iranian 'freemasonry' and 'Ivy League network', signalling that the IRGC
> exceeds ideological devotion.[7]

17.     The IRGC always targeted the United States for terrorist violence. Iran's 1979

revolution was militantly anti-American, and Iran's regime continued such approach ever since.

Since 1979, the IRGC regularly engaged in and supported acts of terrorism directed at the United

States, which targeted the United States government in Washington, D.C. by seeking to coerce it

into changing U.S. policy as sought by the IRGC, including the United States's exit from the

Middle East. "For nearly forty years, the Guards [*i.e.*, the IRGC] … sponsored and commanded

---

[6] Seth J. Frantzman (Author and Iran Scholar), *Why These Iranian Elections Are So Important –
Expert*, Jpost.com (June 4, 2021), 2021 WLNR 18016754.

[7] Dr. Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and
the Communications Economy*, Defence Strategic Communications: The Official Journal of the
NATO Strategic Communications Centre of Excellence 111-12 (Autumn 2020). Although Dr.
Gill primarily analyzed IRGC control of Iran's telecoms sector, her point applies with equal
force to NIOC and the other IRGC fronts described herein because the IRGC practiced a
common terrorist tradecraft with respect to its use of purported "retirement" as cover for
continued illicit IRGC activities designed to enable IRGC support for acts of terrorism.

anti-Western terrorist organizations … [in] the heart of the Middle East" for whom "[h]ighest on

Iran's enemy list [was] the United States … which Tehran threaten[ed] to annihilate."[8]

18.     The United States has long recognized the IRGC's status as the worst enabler of

anti-American terrorist violence in the world. For example, in October 2007, the government

designated the IRGC for sanctions under Executive Order 13382 for its proliferation-related

activities, and designated a branch of the IRGC known as the IRGC's Qods Force ("IRGC-QF")

under Executive Order 13224 for its support of terrorism, including the Taliban in Afghanistan:

> IRGC-Qods Force (IRGC-QF): The Qods Force, a branch of the Islamic
> Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps),
> provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian
> Islamic Jihad, and the Popular Front for the Liberation of Palestine-General
> Command (PFLP-GC).
>
> The Qods Force is the Iranian regime's primary instrument for providing lethal
> support to the Taliban. The Qods Force provides weapons and financial support to
> the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since
> at least 2006, Iran has arranged frequent shipments of small arms and associated
> ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic
> explosives, and probably man-portable defense systems to the Taliban. This
> support contravenes Chapter VII UN Security Council obligations. UN Security
> Council resolution 1267 established sanctions against the Taliban and UN
> Security Council resolutions 1333 and 1735 imposed arms embargoes against the
> Taliban. Through Qods Force material support to the Taliban, we believe Iran is
> seeking to inflict casualties on U.S. … forces.[9]

19.     Similarly, Section 1258 of the 2008 National Defense Authorization Act, Pub. L.

No. 110-181, expressed the sense of Congress that "the United States should designate Iran's

Islamic Revolutionary Guards Corps as a foreign terrorist organization," and also place it "on the

list of Specially Designated Global Terrorists."

---

[8] Mark D. Silinsky, *Empire of Terror: Iran's Islamic Revolutionary Guard Corps*, at xxv (2021).

[9] *See* U.S. Dep't of Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007), https://home.treasury.gov/news/press-releases/hp644.

20.     In 2017, the United States designated the IRGC as a Specially Designated Global Terrorist "for providing support to a number of terrorist groups, including Hizballah and Hamas, as well as to the Taliban" and for "provid[ing] material support to the IRGC-QF, including by providing training, personnel, and military equipment."[10]

21.     In 2019, the United States designated the IRGC a Foreign Terrorist Organization ("FTO"). In support, the State Department concluded that the IRGC "has engaged in terrorist activity since its inception 40 years ago," that "its support for terrorism is foundational and institutional," that it "has killed U.S. citizens," and that it "has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign."[11] Announcing the designation, then-Secretary of State Mike Pompeo emphasized that the IRGC "plans, organizes, and executes terror campaigns all around the world," and that the "IRGC institutionalized terrorism shortly after its inception, directing horrific attacks . . . alongside the terror group it midwifed, Lebanese Hizballah."[12] Secretary Pompeo described the designation as "simply recognizing a basic reality," placing the IRGC in "its rightful place on the same list as terror groups it sponsors."[13]

22.     The IRGC's terrorist-support function consists principally of three component divisions: the Regular IRGC, the IRGC-QF, and Hezbollah. These three divisions all report to Iran's Supreme Leader, Ayatollah Khamenei; they have overlapping interests and responsibilities

---

[10] U.S. Dep't of Treasury, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (Oct. 13, 2017), https://home.treasury.gov/news/press-releases/sm0177.

[11] U.S. Dep't of State, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html.

[12] Secretary of State Michael R. Pompeo Remarks to the Press (Apr. 8, 2019), https://2017-2021-translations.state.gov/2019/04/08/secretary-of-state-michael-r-pompeo-remarks-to-the-press-5/index.html.

[13] *Id*.

vis-à-vis terrorism; and they operate as an integrated whole with respect to their support for anti-American terrorism worldwide. Thus, with respect to promoting terrorism against Americans, the IRGC's three divisions share funds, resources, and expertise; they provide logistical support to each other; and they divide labor to efficiently export terror.

23.     Among these three groups, the Regular IRGC operates principally inside Iran. In addition to suppressing dissent in Iran, the Regular IRGC also operates front companies for the IRGC's terrorist finance, logistics, illicit technology acquisition, and intelligence activities.

24.     Pursuant to Iranian directive dated June 11, 2003, and in force ever since, the IRGC was authorized and encouraged to act as contractors in development schemes, subject to the requirement that any profit would be used to help "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, the IRGC's central Anti-American terrorist mission under Iran's constitution.[14] As a result, IRGC profits were required under Iranian law to be reinvested in the IRGC's specific lanes of activity that supported terrorism.

25.     Public reports revealed that the IRGC was taking over large segments of the Iranian economy no later than the mid-2000s. For example, an article entitled *IRGC, Inc.* published by the think tank American Enterprise Institute ("AEI") on May 17, 2007, reported that one effect of sanctions on Iran would be to block European and Asian businesses from doing business there, causing Iran to turn to the IRGC "to fulfill its commercial and infrastructural needs. In the process, the IRGC will fill its coffers with billions of dollars, and further export its brand of terror."[15] The article further explained that "IRGC money is fungible," such that

---

[14] Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy*, Middle Eastern Outlook (Oct. 2007), https://www.aei.org/research-products/report/how-intertwined-are-the-revolutionary-guards-in-irans-economy/.

[15] Omeed Jafari, *IRGC, Inc.*, AEI (May 17, 2007), https://www.aei.org/articles/irgc-inc/.

revenue from commercial projects would likely fund paramilitary forces and "cement Iran's sponsorship of terrorist organizations like Hezbollah and Hamas and grease the flow of sophisticated weaponry to these terror groups."[16]

26.     A second article, published in October 2007, explained that "the IRGC is an economic powerhouse," and that "[t]hroughout the 1990s, the IRGC . . . extended its influence into the lucrative oil and gas sectors."[17] The article further explained the June 11, 2003 directive, as providing that any profit should be "'transferred to the Chancery,' which in turn would fund not only the contract in question, but would use any surplus to purchase and upgrade equipment for the Revolutionary Guards and fund its other activities."[18] The article noted that after the directive, "[t]he IRGC now interprets its operational freedom so broadly that it accepts no constitutional restrictions. … In effect, as long as the supreme leader supports the IRGC, any action it takes is legal."[19]

27.     In October 2007, the United States designated the IRGC for sanctions under Executive Order 13382 for its proliferation-related activities, which prohibited all transactions between U.S. persons and the IRGC, and subjected all IRGC assets in U.S. jurisdiction to seizure. It also "notif[ied] the international private sector of the dangers of doing business with . . . the many IRGC-affiliated companies that pervade several basic Iranian industries."[20]

28.     At all times thereafter, the IRGC has continued to raise funds and other resources that have been used to support acts of terrorism, and the United States has continually imposed

---

[16] *Id.*

[17] Alfoneh, *supra* n.14.

[18] *Id.*

[19] *Id.*

[20] Fact Sheet *supra* n.9.

sanctions on the IRGC and its fronts. As the U.S. Treasury Department found when it sanctioned IRGC actors in February, 2010, the IRGC was consolidating "control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders."[21] The Treasury Department specifically noted that "[t]he IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and oil industries, controlling billions of dollars of business. The profits from these activities are available to *support the full range of the IRGC's illicit activities, including* [weapons of mass destruction] proliferation and *support for terrorism*."[22] Later that year, the Treasury Department reiterated that "[w]ith the IRGC's expanding influence and control over broader segments of the Iranian economy—including the defense production, construction, and oil and gas industries—increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct."[23]

29.     In 2010 and 2012, the IRGC was designated for sanctions under Executive Order 13553 and 13606 for human rights abuses. In 2017, the Treasury Department designated the IRGC a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224 for "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."[24] In 2019, the State Department designated the IRGC an FTO.

---

[21] U.S. Dep't of Treasury, Press Release, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010), https://home.treasury.gov/news/press-releases/tg539.

[22] *Id*. (emphasis added).

[23] U.S. Dep't of Treasury, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010), https://home.treasury.gov/news/press-releases/tg1010.

[24] U.S. Dep't of Treasury, Press Release, *Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (Oct. 13, 2017), https://home.treasury.gov/news/press-releases/sm0177.

30.     Terrorism experts echoed the government's concerns. In April 2010, Michael Ledeen of the Foundation for Defense of Democracies published an article explaining that "the IRGC has become enormously powerful and fabulously rich," controlling "between one-third and one-half of the major enterprises inside Iran, and over a thousand foreign firms."[25] Ledeen explained that although the IRGC's "total budget is secret," its "annual profits surely run into many billions of dollars. Some of this money goes to private accounts, some of it is laundered overseas. Then it is provided to the world's leading terrorist organizations, and some is reinvested in the Guards' businesses."[26] The article further explained that "America's main concern with the Guards is that they have directly and indirectly killed a lot of our service personnel," and that "Americans have repeatedly been targeted by IRGC killers, or by their favorite proxies, Hezobllah and al Qaeda."[27] This included operations "against U.S. forces in Afghanistan," which was known "from the winter of 2001-2002, when we uncovered teams of Iranian-trained killers there."[28]

31.     Mark Dubowitz, the President of the Foundation for Defense of Democracies and an expert on Iran and the IRGC, similarly testified in the criminal trial related to this case that the IRGC controlled between 20 and 40 percent of the Iranian economy, with heavy involvement in the financial, commercial, construction, energy, and defense industries. This control occurred formally in the sense that the IRGC owned certain companies in its own name, and also informally in the sense that IRGC loyalists (including current and former commanders) were

---

[25] Michael A. Ledeen, *Iran's 'Foreign Legion' Takes on America*, VFW, Veterans of Foreign Wars Magazine (Apr. 2010).

[26] *Id.*

[27] *Id.*

[28] *Id.*

often placed in positions of authority in companies the IRGC does not own to ensure that those companies act in ways that benefit the IRGC.

32.     The IRGC-QF is the IRGC's Iranian-staffed external security operations division. The IRGC-QF works principally outside of Iran, directing the IRGC's resources to support and sponsor anti-American terrorist organizations around the globe. The U.S. Treasury Department designated the IRGC-QF an SDGT in October 2007, explaining that the IRGC-QF is "a branch of the Islamic Revolutionary Guard Corps" that "provides material support to the Taliban, Lebanese Hizballah," and other terrorist organizations.[29]

* * *

33.     When it comes to efforts to inflict casualties on the United States, the IRGC's divisions operate as a cohesive whole. Thus, the IRGC's divisions all report to Iran's Supreme Leader, and collaborate to support anti-American terrorist groups worldwide. This anti-Americanism is part of a deeply rooted ideology that sees American presence in the Middle East as a threat to the objectives of the Iranian Revolution, and accordingly seeks to expel the United States and its allies from the region.

34.     This collaboration between the IRGC's divisions also means that resources earned by one IRGC division flow through to the others, and to the terrorist organizations they support. Thus, funds raised by the Regular IRGC's fronts readily find their way to the IRGC-QF and Hezbollah, as well as the IRGC's anti-American terrorist proxies elsewhere.

**B.      The IRGC's Front: the National Iranian Oil Company**

35.     NIOC is the entity responsible for exploring and exporting Iran's oil. It is a government-owned business overseen by the Iranian Ministry of Petroleum.

---

[29] Fact Sheet, *supra* n.9.

13

36.     By 2012, NIOC was a known front for the IRGC. The public sources describing
this relationship—which were available as early as 2010—are cited and quoted at more length
*infra* in Part I.C of the Factual Allegations. But the relationship was sufficiently clear that in
August of 2012, Congress enacted a statute expressing its sense that NIOC was an agent or
affiliate of the IRGC, and ordered the Treasury Department to determine if it was so. In
September 2012, the Treasury Department concluded that the answer was "yes," and NIOC was
officially sanctioned as an IRGG agent or affiliate, *i.e.*, an IRGC front.[30]

37.     NIOC has affiliates, including the Naftiran Intertrade Company Ltd. ("NICO"), an
entity that handles much of NIOC's overseas trade. NICO was sanctioned in 2013 for its
relationship to NIOC and, by extension, the IRGC.

38.     NIOC directed funds to the IRGC through a web of contracting arrangements with
other IRGC businesses. NIOC's revenues thus flowed through to the IRGC, the IRGC-QF, and
Hezbollah—and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere,
including in Afghanistan.

**C.      The IRGC's Terrorist Proxies in Afghanistan: the al-Qaeda Syndicate**

39.     Afghanistan borders Iran directly to the east. There, the IRGC supported al-Qaeda
and the Taliban, including its Haqqani Network. These terrorist organizations jointly planned and
executed attacks on Americans in Afghanistan throughout the time period relevant to this case.
They shared the IRGC's goal of expelling the United States from the region, and the IRGC
provided these organizations with support—including funds, weapons, training, technology, and

---

[30] U.S. Dep't of the Treasury, Press Release, *Treasury Submits Report to Congress on NIOC and NITC* (Sept. 24, 2012), https://home.treasury.gov/news/press-releases/tg1718.

logistical assistance—to advance this common cause. Al-Qaeda and the Taliban (including its Haqqani Network) thus acted as proxies for the IRGC in Afghanistan.

40.     Al-Qaeda is an infamous Sunni terrorist organization that has been a designated FTO since October 8, 1999. As explained in greater detail below, al-Qaeda was responsible for committing, planning, and/or authorizing the vast majority of all terrorist attacks against Americans and Coalition forces in Afghanistan during the relevant time period, including every attack at issue in this case.

41.     The Taliban is a Sunni terrorist organization formed by former mujahideen fighters who had expelled the Soviet Union from Afghanistan. The Haqqani Network is the most radical part of the Taliban. The United States designated the Taliban an SDGT on July 3, 2002, along with its leader, Mullah Omar. On December 26, 2007, Congress enacted a law declaring that, for purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act . . ., the Taliban shall be considered to be a terrorist organization." Consolidated Appropriations Act of 2008, § 691(d), Pub. L. No. 110-161, 121 Stat 1844 (2007). Throughout the 2000s, the United States designated leaders in the Haqqani Network, including Sirajuddin Haqqani and multiple family members, as SDGTs. The Haqqani Network itself was designated an FTO on September 19, 2012.

42.     These anti-American terrorist groups, along with others, formed a mafia-style terrorist syndicate to jointly attack Americans in Afghanistan. This syndicate superstructure was publicly acknowledged by multiple senior officials, including then-Secretary of State Hillary Clinton (in 2009), then-Secretary of Defense Robert Gates (in 2010), and then-Undersecretary of Defense Michele Flournoy (in 2011). These officials all opined that the lines between al-Qaeda,

the Taliban, the Haqqani Network, and their terrorist allies were blurred, and that these organizations worked together to attack Americans in Afghanistan.

43.     Terrorism experts and scholars including Bruce Riedel (a former CIA analyst), Bill Roggio and Thomas Joscelyn (senior fellows at the Foundation for Defense of Democracies and editors of the *Long War Journal*), and others similarly publicly commented that al-Qaeda and the Taliban (including its Haqqani Network) were closely intertwined as a terrorist syndicate that shared resources and collaborated to plan and commit terrorist attacks on Americans in Afghanistan.

44.     The U.S. District Court for the District of Columbia recently found as a matter of fact that multiple terrorist groups operating in Afghanistan—"including the Taliban, the Haqqani Network, the Kabul Attack Network, and al-Qaeda—made up a terrorist 'syndicate,'" defined as "a group of terrorists or terrorist organizations combined to promote a common interest"—in this case "attack[ing] Western and Afghan government targets."[31] The court found that the members of the Syndicate "shared close strategic, tactical, and operational coordination, which enabled each group to make its operations more lethal for American forces."[32] The attack period in *Cabrera* (from 2006 to 2019) encompassed the period of attacks at issue here, and so this finding is equally valid with respect to the attacks in this case.

45.     Under the syndicate superstructure, providing support to al-Qaeda or the Taliban (including its Haqqani Network) was tantamount to aiding all of these organizations because they planned and committed attacks together. Starting in the mid-2000s, public sources emphasized that "[t]he line between the Taliban and al Qaeda is increasingly blurred, especially

---

[31] *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *6 (D.D.C. July 19, 2022).

[32] *Id.*

from a command and control perspective."[33] By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly. "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[34] And as Lieutenant General Ronald L. Burgess, Jr. stated in a February 2010 Hearing of the Senate Select Committee on Intelligence, "al Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues." By the fall of 2009, noted journalist Peter Bergen publicly stated, "the Taliban and Al Qaeda function more or less as a single entity. The signs of this are everywhere."[35] As a result of this high level of coordination, any support to al-Qaeda or the Taliban (including its Haqqani Network) necessarily flowed through to that organization's syndicate partners, too.

46.    These groups also raised money together and shared resources. For instance, the Haqqani Network ordinarily managed the Taliban's transnational terrorist finance and logistics operations and often aided al-Qaeda's as well. When doing so, the Haqqani Network used its network of agents, operatives, and fronts in the U.A.E. as an alias for its fellow syndicate terrorists. The Treasury Department determined that the Haqqani Network regularly used its transnational terrorist finance activities to fund multiple al-Qaeda-affiliated syndicate members simultaneously. For example, on February 9, 2011, the Treasury Department designated Syndicate operatives, Said Jan Abd Al-Salam and Khalil Al-Rahman Haqqani (Jalaluddin's brother), as SDGTs to "target[] the financial and support networks of al-Qa'ida, the Taliban and

---

[33] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[34] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[35] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009).

17

the Haqqani Network leadership."[36] And according to Haqqani Network expert Gretchen Peters, international "funding streams" were "intertwined across" amongst al-Qaeda, the Haqqani Network, and the Taliban.[37] As Ms. Peters explained in 2012, al-Qaeda, the Haqqani Network, and their allies "derive[d] income in and outside Afghanistan" and their "money move[d] between key network actors and into banks in Pakistan, the [U.A.E.] and beyond."[38] Accordingly, financial and other material support to any syndicate group assisted all of them.

47.     Because the syndicate organizations were operationally fused, many attacks committed by one syndicate organization (*e.g.*, the Taliban) were often either committed jointly with another organization, or were planned or authorized by that organization. As the court found in *Cabrera*, "[a]l-Qaeda provided significant operational support to the Taliban in planning and authorizing terrorist attacks," including "aiding the Taliban in developing tactics, especially suicide bombings, by providing ideological and technical expertise," and by paying "the families of Taliban suicide bombers."[39] "Taliban insurgents trained at al-Qaeda camps both within and outside Afghanistan," and "a component of al-Qaeda fought alongside the Taliban and later reorganized and embedded itself within the Taliban's structure, fielding small units and embedding military trainers who instructed Taliban fighters on waging a successful insurgency."[40]

---

[36] U.S. Dep't of Treasury, Press Release, *Treasury Targets the Financial And Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011), https://home.treasury.gov/news/press-releases/tg1055.

[37] Gretchen Peters, *Haqqani Network Financing: The Evolution of an Industry* 32, Combatting Terrorism Ctr. (July 2012).

[38] *Id.*

[39] *Cabrera*, 2022 WL 2817730, at *9.

[40] *Id.*

48.     These public sources describing the close linkages between al-Qaeda and the Taliban (including its Haqqani Network) are only the tip of the iceberg. Additional sources reveal that these organizations shared key leaders—for example, Sirajuddin Haqqani, who was simultaneously: (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, its terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir). In addition to his attack planning role, Sirajuddin Haqqani played key roles in syndicate finance, and also in the manufacture of explosives for syndicate attacks. Public sources further reveal that al-Qaeda provided essential religious and logistical support to certain Taliban attack methods (especially suicide bombings, which the Taliban considered taboo before al-Qaeda's influence changed its views, and the use of improvised explosive devices ("IEDs"), which the Taliban learned from al-Qaeda). And they show that attacks on Americans were frequently planned at mafia-style meetings attended by al-Qaeda, Taliban, and Haqqani Network terrorists.

49.     As noted above and alleged in greater detail below, the IRGC notoriously provided robust support to al-Qaeda and the Taliban, including its Haqqani Network, for the specific purpose of supporting those entities' attacks on American forces in Afghanistan. The support included funds, weapons, training, logistical assistance, and safe haven, all of which enabled terrorist attacks on Americans. And all of this occurred at a time when the connections between the IRGC and the al-Qaeda syndicate, and between the various syndicate members, were easily observable to third parties in Defendants' position.

### D.  The IRGC's Terrorist Proxies in Iraq and Syria: al-Qaeda, al-Qaeda-in-Iraq, and al-Nusra Front

50.     From 2003 through 2013, the IRGC provided vital aid to al-Qaeda, including its branches in Iraq and Syria, to facilitate al-Qaeda's attacks against Americans in both countries.

51.     The IRGC's aid extended directly to al-Qaeda-in-Iraq ("AQI") and its progeny, al-Nusra Front ("ANF").

52.     The origins of AQI and ANF trace to Abu Musab al-Zarqawi, a Jordanian terrorist who created a training camp in Afghanistan at Osama bin Laden's invitation. By the time of the September 11, 2001 terrorist attacks, Zarqawi had trained several thousand terrorists and established a terrorist network in Iraq, Syria, and other countries in the Middle East.

53.     On or about October 15, 2004, the Secretary of State designated the Zarqawi terrorist network as an FTO under 8 U.S.C. § 1189, under the name Jama'at al-Tawhid wa'al-Jihad.[41] On or about the same day, the Secretary of State also designated Jama'at al-Tawhid wa'al-Jihad under Executive Order No. 13,224 as an SDGT.[42]

54.     In or around October 2004, Zarqawi formally pledged allegiance to al-Qaeda and renamed his terrorist network al-Qaeda in Iraq ("AQI"). By then, Zarqawi and his organization were among the most prominent terrorists attacking Americans in Iraq and elsewhere.

55.     A U.S. airstrike killed Zarqawi in June 2006. But AQI continued after his death as a formidable terrorist group waging a violent campaign against the United States. In 2010, a new

[41] In the Matter of the Designation of Jam'at al Tawhid wa'al-Jihad, Also Known as the Monotheism and Jihad Group, Also Known as the al-Zarqawi Network, Also Known as al-Tawhid, as a Foreign Terrorist Organization Pursuant to Section 219 of the Immigration and Nationality Act, 69 Fed. Reg. 61,292 (Oct. 15, 2004).

[42] Determination Pursuant to Section 1(b) of Executive Order 13224 Relating to the Designation of Jam'at al Tawhid wa'al-Jihad, Also Known as the Monotheism and Jihad Group, Also Known as the al-Zarqawi Network, Also Known as al-Tawhid, 69 Fed. Reg. 61,292 (Oct. 15, 2004).

AQI leader—Abu Bakr al-Baghdadi—took control of the AQI terrorist network. Baghdadi eventually became "the world's most-wanted terrorist chieftain," with the U.S. government at one point offering a record-breaking $25 million bounty for his capture.

56.     In early 2011, shortly after Baghdadi's emergence, Syria spiraled into civil war. Many terrorist groups and other armed factions began vying for power, precipitating a near-total breakdown in Syrian governance and other civil institutions. In August 2011, the U.N. High Commissioner for Human Rights reported "a pattern of widespread or systematic human rights violations by Syrian security and military forces, including murder, enforced disappearances, torture, deprivation of liberty, and persecution."[43]

57.     In late 2011, sensing the opportunity amid the chaos, Baghdadi sent an AQI operative, named Abu Muhammad al-Julani (also spelled al-Jawlani), to establish an AQI branch in Syria. Baghdadi also sent Abu Muhammad al-Adnani (who would later lead ISIS's global Intelligence Cell) to assist Julani. The resulting Syrian branch was called the al-Nusrah Front ("ANF"), which Baghdadi and Julani formed officially in January 2012.

58.     By the end of 2012, the U.S. government recognized ANF as AQI's Syrian branch. In December 2012, the Secretary of State amended the FTO designation for AQI to include the following aliases: al-Nusrah Front ("ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.[44] At the time, the State Department reported that ANF had already claimed responsibility for nearly 600 terrorist attacks

---

[43] Statement by Ms. Navi Pillay, UN High Commissioner for Human Rights to the Human Rights Council 17th Special Session on "Situation of human rights in the Syrian Arab Republic" in Geneva (Aug. 22, 2011), https://www.ohchr.org/en/statements/2011/08/statement-ms-navi-pillay-un-high-commissioner-human-rights-human-rights-council?LangID=E&NewsID=11321.

[44] Amendment of the Designation of al-Qa'ida in Iraq, 77 Fed. Reg. 73,732 (Dec. 11, 2012).

throughout Syria. The State Department characterized ANF as carrying out AQI's campaign to "hijack the struggles of the Syrian people for its own malign purposes."[45]

### JURISDICTION AND VENUE

59.     This Court has subject matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

60.     The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, does not deprive this Court of subject matter jurisdiction because: (1) a majority of Halkbank's shares are not directly owned by the government of Türkiye, and Halkbank is therefore not an instrumentality of the Turkish government entitled to claim sovereign immunity; and (2) even if Halkbank were an instrumentality of the Turkish government, its conduct as alleged herein is a "commercial activity" within the meaning of 28 U.S.C. § 1605(a)(2).[46]

61.     The Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1) and/or 4(k)(2), and 18 U.S.C. § 2334(a). Jurisdiction in the United States comports with due process because (1) Defendants deliberately chose to launder at least approximately $1 billion through correspondent accounts at U.S. financial institutions; (2) Defendants' representatives traveled to the United States to lie to Treasury Department officials in Washington, D.C. as part of their unlawful terrorist support scheme; and (3) Defendants

---

[45] Victoria Nuland, *Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq* (Dec. 11, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm.

[46] *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 348-50 (2d Cir. 2021) (holding that Halkbank's alleged misconduct would fall under FSIA's "commercial activity" exception even if FSIA would otherwise immunize Halkbank from criminal prosecution). The Supreme Court affirmed in relevant part on the alternative ground that the FSIA does not apply in criminal cases. *See Turkiye Halk Bankasi A.S., aka Halkbank v. United States*, 143 S. Ct. 940, 951 (2023).

participated in a conspiracy to influence U.S. foreign policy through terrorism, thus directing conduct at the United States.

62.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims, including correspondent banking transfers of at least approximately $1 billion, occurred in this District.

## FACTUAL ALLEGATIONS

63.     Plaintiffs' allegations are based on information derived from confidential witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence reporting, congressional testimony and reports, press accounts, and Plaintiffs' recollections. They are also based on information revealed during the completed criminal prosecutions of Zarrab (which resulted in a guilty plea to seven violations relating to anti-terrorism sanctions, bank fraud, money laundering, and bribery), the completed criminal prosecution of Mehmet Hakan Atilla (Halkbank's deputy general manager for international banking, who was convicted of conspiracy to defraud the United States, conspiracy to violate sanctions laws, bank fraud, and conspiracy to commit money laundering), and the ongoing criminal prosecution of Halkbank for the acts alleged herein. Those criminal proceedings are being adjudicated before the honorable Judge Berman under case number 15-cr-867 (RMB).

I.    **DEFENDANTS KNOWINGLY PROVIDED SUBSTANTIAL UNLAWFUL ASSISTANCE TO THE IRGC AND ITS TERRORIST PROXIES PURSUANT TO AN AGREEMENT TO ASSIST THE IRGC IN PURSUING ITS FOREIGN POLICY AGENDA**

    A.    **By 2012, U.S. Anti-Terrorism Sanctions Effectively Froze the National Iranian Oil Company's Assets in Türkiye, Depriving the IRGC of Billions of Dollars in Revenue**

64.     The 1979 "Islamic Revolution" was fueled in large part by militant anti-Americanism. Eliminating the United States' role in the region surrounding Iran—including

23

through violence—was and remains the constitutional mandate of the IRGC, as the guardians of the "revolution." To export its Islamic Revolution, the IRGC has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of the Ayatollah's will.

65.    The IRGC's support of terrorist proxies like al-Qaeda, al-Nusra Front, and the Taliban is well-documented. *See* Part I.C, *infra*. Indeed, largely in response to the IRGC's activities, the U.S. State Department formally designated Iran as a State Sponsor of Terrorism in 1984, and has maintained that designation at all times since. In 2008, it observed that the IRGC was "directly involved in the planning and support of terrorist acts throughout the region and continued to support a variety of groups in their use of terrorism to advance their common regional goals," including "Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[47]

66.    These designations and others resulted in crippling sanctions on the IRGC, on IRGC-run enterprises, and on businesses and individuals that have enabled the IRGC's support for terrorism and violence. In particular, U.S. sanctions have targeted the IRGC's three core components: Regular IRGC, the Qods Force, and the Hezbollah division. These three IRGC divisions all answer only to Iran's Supreme Leader, Ayatollah Ali Khamenei. They also share resources in pursuit of their common objectives, which include expelling the United States from the Middle East by inflicting massive casualties on Americans in the region.

67.    The IRGC simultaneously controls large swaths of the Iranian economy and plays a central role in Iran's promotion of terrorism against Americans—and those two roles are not a coincidence. Instead, the IRGC seeks to control Iran's economy because doing so grants the

---

[47] U.S. Dep't of State, *Country Reports on Terrorism 2007*, at 172 (Apr. 2008).

IRGC access to resources that allow it to more effectively prosecute acts of terrorism worldwide. Consequently, the IRGC's business interests are inextricably intertwined with its terrorism.

68.     The United States government has itself embraced and publicized that understanding of the IRGC's role. For example, in October 2007, the Department of State designated the IRGC for its role in nuclear proliferation, and the Treasury Department designated the IRGC-QF an SDGT "for providing material support to the Taliban and other terrorist organizations."[48] The Treasury Department explained that its designations were designed to "notify the international private sector of the dangers of doing business with . . . the many IRGC-affiliated companies that pervade several basic Iranian industries."[49] It further explained that the IRGC-QF "is the Iranian regime's primary instrument for providing lethal support to the Taliban," including "weapons and financial support . . . in Afghanistan," including shipments of small arms, rocket propelled grenades, mortar rounds, rockets, plastic explosives, and man-portable defense systems. This support was designed "to inflict casualties on U.S. and NATO forces" in Afghanistan.[50]

69.     As another example, on February 10, 2010, the Treasury Department sanctioned Khatam al-Anbiya, an IRGC construction firm. The designation explained that the action was intended "to implement existing U.S. sanctions against Iran's Islamic Revolutionary Guard Corps (IRGC)," and that the designation included "IRGC General Rostam Qasemi, who is also the commander of Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations."[51] The Treasury

---

[48] Fact Sheet, *supra* n.9.

[49] *Id.*

[50] *Id.*

[51] Press Release, *supra* n.21.

Department elaborated that "[a]s the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world. . . Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities."[52]

70.     In that same February 2010 designation, the Treasury Department specifically called out the IRGC's "growing presence in Iran's . . . oil industr[y]," explaining that "[t]he profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and support for terrorism."[53] The Treasury Department emphasized that the "IRGC-QF is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia." [54] "The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC) and IRGC-QF to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups." [55] For example, "[i]n Afghanistan, the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training." [56]

---

[52] *Id.*

[53] *Id.*

[54] U.S. Dep't of Treasury, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010), https://home.treasury.gov/news/press-releases/tg810.

[55] *Id.*

[56] *Id.*

71.     On August 3, 2010, the Treasury Department announced additional designations designed to "expose Iran's use of its state apparatus—including the Islamic Revolutionary Guard Corps-Qods Force—and state-run social service organizations to support terrorism under the guise of providing reconstruction and economic development assistance or social services."[57]

72.     On December 21, 2010, the Treasury Department designated additional IRGC entities, again explaining that "[t]he IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's missile and nuclear programs, its support for terrorism, as well as its involvement in serious human rights abuses. . . With the IRGC's expanding influence and control over broader segments of the Iranian economy—including the defense production, construction, and oil and gas industries—increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct."[58]

73.     On June 23, 2011, the Treasury Department sanctioned additional IRGC entities, again explaining that "[a]s Iran's isolation has increased, the IRGC has expanded its reach into critical sectors of Iran's economic infrastructure—to the detriment of the Iranian private sector—to generate revenue and conduct business in support of Iran's illicit activities. Today's actions target core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its proliferation activities and other illicit conduct."[59] Indeed, the Treasury Department emphasized that "imposing financial sanctions on commercial

---

[57] *Id.*

[58] Fact Sheet, *supra* n.23.

[59] U.S. Dep't of the Treasury, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011), https://home.treasury.gov/news/press-releases/tg1217.

enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct."[60]

74.     Against the backdrop of these designations, the United Nations and Congress were acting as well. In 2010, the United Nations Security Council issued Resolution 1929, which imposed robust multilateral sanctions on the IRGC. Congress responded by enacting the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"). This statute strengthened existing U.S. sanctions with respect to the Iranian energy industry, and added the potential for the imposition of serious limits on foreign financial institutions' access to the U.S. financial system if they engage in certain transactions including Iran—including specifically any significant transaction or significant financial services for the IRGC or any of its sanctioned agents or affiliates, any effort of the IRGC or its agents and affiliates to provide support for foreign terrorist organizations or acts of international terrorism, or any money laundering relating to those objectives. The sanctions specifically include any efforts to assist the Central Bank of Iran (also known as Bank Markazi) in carrying out prohibited activities.

75.     The Treasury Department implemented CISADA with the Iranian Financial Sanctions Regulations ("ISFR"), which provide in relevant part that any foreign financial institution that provides services to IRGC affiliates risks losing the ability to open correspondent or payable-through accounts in America. These sanctions are known as "secondary sanctions," which reach overseas activity by foreigners vis-à-vis sanctioned entities (as opposed to primary sanctions, which regulate activity vis-à-vis the United States and U.S. persons abroad).

76.     These sanctions and designations, and others like them, created tremendous economic pressure on the IRGC. By 2011, the IRGC's economic interests were faltering

---

[60] *Id.*

alongside the Iranian economy, and Iran's currency was unstable. Thus, in March of 2011, the

Supreme Leader of Iran, Ayatollah Khamenei, declared a year of "economic jihad," which he

described as "a purposeful movement meant to counter the enemy's ill-intentioned and hostile

movement," *i.e.*, sanctions targeting the IRGC.

77.     The term "economic jihad" was a deliberately loaded one, referring both to

frustrating the intent of anti-IRGC sanctions and also to funding IRGC jihadists including the

IRGC's terrorist proxies. Historically and at the time, terrorist groups like the IRGC, al-Qaeda,

and Hamas used calls for "economic jihad" to raise money.[61] Indeed, noted terrorism expert Dr.

Matthew Levitt explained that "'Economic Jihad' is a theme that features prominently in Jihadist

fundraising techniques. The concept is simple: leaders call on their supporters to engage in what

they describe as a religious duty to engage in Jihad, if not by physically fighting Islam's enemies

then by funding those that do."[62] Ayatollah Khamenei drew on this tradition, stressing that jihad

included many "military, political, economic, cultural, and social aspects," including the

"resistance economy" and "cultural war" against the West.[63] And "[s]ince Khamenei first used"

the term "resistance economy" "in 2010, it has generally carried two related if different

---

[61] *See, e.g.*, Jonathan Fighel, *Hamas Calls For "Economic Jihad" Against the U.S.*, International Institute for Counter-Terrorism (Oct. 2, 2003), https://ict.org.il/hamas-calls-for-economic-jihad-against-the-u-s/.

[62] Matthew Levitt, *Countering the Theological Case for 'Economic Jihad' Is Vital*, Royal United Services Institute (RUSI) Publication (Nov. 19, 2007) https://rusi.org/publication/countering-theological-case-economic-jihad-vital (providing examples of calls for economic jihad by Hezbollah, al-Qaeda, and their supporters).

[63] Mehdi Khalaji, *Observations on the Islamic State in Iran*, Hudson Institute (July 17, 2020), https://www.hudson.org/research/16219-observations-on-the-islamic-state-in-iran.

meanings—a push for self-sufficiency and domestic production, and secondly a commitment to the central place in the economy of 'committed' bodies like the IRGC."[64]

78.     Among other steps in its pursuit of economic jihad, the Iranian regime appointed Rostam Ghasemi—the sanctioned IRGC general who previously led Khatam al-Anbiya—to lead the Ministry of Petroleum, which supervises and controls NIOC. Even in his new role as Minister of Petroleum, Ghasemi professed his continuing allegiance to the IRGC and described himself to the Iranian parliament as a "soldier." The IRGC, for its part, described Ghasemi's new role as a "meaningful and critical response to the attacks against the guards from the west's media empire."[65] In effect, Ghasemi's ascension comprised the IRGC's full takeover of the Ministry of Petroleum and of NIOC, providing the IRGC with even greater access to Iran's oil revenues (through NIOC and NIOC's contracts with other IRGC entities). *See* Part I.C, *infra*.

79.     Public sources immediately alerted Defendants that NIOC's transactions aided IRGC-sponsored terrorist attacks targeting the United States. Terrorism experts testified to Congress in 2011 that "NIOC operates as the ultimate front company obscuring the role of the IRGC in the oil trade," and explained that Ghasemi's appointment would only deepen the preexisting ties between NIOC and the IRGC.[66] Expert organization United Against Nuclear Iran ("UANI") wrote that "working with NIOC and the IRGC" would "directly contribut[e] to Iran's

---

[64] Gareth Smyth, *Deciphering the Iranian Leader's Call for a 'Resistance Economy'*, Guardian, (Apr. 16, 2016), https://www.theguardian.com/world/iran-blog/2016/apr/19/iran-resistance-economy-tehranbureau.

[65] *See* U.S. Dep't of the Treasury, *Written Testimony of Under Secretary David S. Cohen before the Senate Committee on Banking, Housing, and Urban Affairs* (Oct. 13, 2011), https://home.treasury.gov/news/press-releases/tg1323.

[66] Mark Dubowitz, Congressional Testimony in Progress of the Obama Administration's Policy Toward Iran, Hearing before the Subcomm. on Nat'l Sec., Homeland Defense & Foreign Operations, at 9 (Nov. 15, 2011), https://oversight.house.gov/wp-content/uploads/2012/01/11-15-11_Dubowitz_NatSec_Testimony.pdf.

capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs"—for example by bankrolling "groups in Iraq and Afghanistan that execute attacks against American and NATO servicemen," including specifically "the Taliban," which was "being actively supported by Iran."[67]

80.    The United States responded by increasing sanctions pressure on the IRGC to prevent the IRGC from using oil revenues to support terrorism. On December 31, 2011, Congress in the National Defense Authorization Act ("2012 NDAA") blacklisted Bank Markazi, imposing sanctions on foreign financial institutions doing any significant financial transactions with that bank, as well as several other IRGC-affiliated financial institutions, with only limited exceptions. These sanctions were imposed because Bank Markazi—which was a principal repository of Iranian oil revenue—had stopped playing the role exclusively of a central bank, and was participating actively in the IRGC's illicit transactions, including transferring funds used to support IRGC-backed terrorism.

81.    In August of 2012, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), Section 312 of which directed the Treasury Department to determine whether NIOC was acting as an agent or affiliate of the IRGC. A month later, the Treasury Department publicly announced that the answer was "yes." The finding that NIOC was effectively a front for the IRGC, triggered additional sanctions on NIOC. Specifically, under the ITRSHRA, NIOC was sanctioned for providing support to the IRGC. And under CISADA and the IFSR, foreign financial institutions determined to knowingly facilitate significant transactions or provide significant financial services for NIOC were subject to sanctions, including the

---

[67] *Continuing GAO Campaign, UANI Calls on Italian Energy Company Edison to End Business in Iran*, Business Wire (Nov. 30, 2011), https://tinyurl.com/3cjj626t.

prohibition or imposition of strict conditions on the opening or maintaining of correspondent or payable-through accounts in the United States. NIOC was also listed on the Specially Designated Nationals ("SDN") list (a list of sanctioned entities), specifically with an "IRGC" identifier after its name. As the Foundation for Defense of Democracies explained after the Treasury Department's determination, "U.S. law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization and nuclear proliferator."[68]

82. By threatening to cut foreign financial institutions off from the U.S. financial system if they continued to deal in any significant way with Bank Markazi and NIOC, these sanctions essentially forced foreign financial institutions to choose between dealing with IRGC fronts, or maintaining access to U.S. dollar trading—and prompted most financial institutions to curtail their services for IRGC companies. This made it extremely difficult for the IRGC to access revenue from its oil sales, and also to access the international financial system.

83. This created a problem for Iran vis-à-vis Türkiye, a major importer of Iranian oil. Acting through illicit IRGC-brokered transactions, the Iranian regime was selling billions of dollars of oil to Türkiye, with the proceeds credited to accounts held at Halkbank either by NIOC or by Bank Markazi for NIOC's (and, by extension, the IRGC's) benefit. Those proceeds could not be remitted to the IRGC or converted into useful international currencies (*e.g.*, U.S. dollars) without running afoul of the secondary sanctions, and so the money was effectively frozen in these entities' Halkbank accounts. By 2012, billions of dollars were frozen this way.

---

[68] Foundation for Defense of Democracies, Press Release, *FDD Applauds Congress and Treasury for New Iran Sanctions* (Sept. 23, 2012), https://www.fdd.org/analysis/2012/09/23/fdd-applauds-congress-and-treasury-for-new-iran-sanctions/.

**B.     Defendants Helped the National Iranian Oil Company, a Known IRGC Front, Evade U.S. Anti-Terrorism Sanctions to Launder Over $20 Billion in Frozen Assets**

84.     Beginning in 2012, Defendants began laundering the IRGC's NIOC oil proceeds deposited at Halkbank. In general, the scheme worked by moving the IRGC's money within Halkbank to conceal its origin, and then moving the IRGC's money out of Halkbank using fraudulently documented gold trades to further mask its connection to the IRGC and its related financial institutions and companies. Thus, oil money held in Halkbank accounts for NIOC and Bank Markazi (for the benefit of NIOC and, by extension, the IRGC) typically moved first to the Halkbank account of another IRGC-affiliated bank, for example Bank Mellat (designated for sanctions in 2007) or its currency exchange subsidiary Mellat Exchange, or Bank Sarmayeh or its subsidiary Sarmayeh Exchange. From there, the IRGC's money would then move to the Halkbank account of one of Zarrab's many companies, which mostly, but not entirely, operated under an umbrella organization called Royal Group that included Royal Holding A.S., Durak Doviz Exchange, Al Nafees Exchange, Royal Emerald Investments, Asi Kiymetli Madenler Turizm Otom, ECB Kuyumculuk Ic Vedis Sanayi Ticaret Limited Sirketi, Gunes General Trading LLC, and others. Zarrab's company then used the IRGC's money to purchase gold in Türkiye from a third party—transferring the funds to the third party's Halkbank account. This part of the scheme, which involved multiple transactions occurring entirely inside Halkbank, allowed the IRGC's money to move from sanctioned IRGC-affiliated government entities to an unaffiliated third party without triggering outside scrutiny. The gold Zarrab purchased was then exported to Zarrab's companies in Dubai, which sold it to another third party. Zarrab would then take instructions from his IRGC co-conspirators about what to do with the proceeds of the gold sale. Most often, the IRGC would direct Zarrab to make international payments on its behalf. Thus, Zarrab's Dubai companies effectively became payment agents for the IRGC. But because

Zarrab's companies were private Dubai companies, the fact that the funds were being transferred on behalf of NIOC and sanctioned IRGC-affiliated banks was concealed from the international banks processing the payments (which often were U.S. banks). Thus, the IRGC evaded the NIOC IRGC sanctions, and Halkbank evaded secondary sanctions.

85.     Zarrab commenced the scheme by writing in late 2011 to Iranian President Mahmoud Ahmadinejad (himself, an IRGC member), and to the head of Bank Markazi. Zarrab's letter denounced what he described as "world-devouring imperialism," and stated that "serving our beloved nation is a religious duty for every Iranian, in the year of Economic Jihad." Zarrab represented that his family, "with half a century of experience in exchange and moving of currency and having been able to set up branches in the United Emirates, Turkey, Russia and Azerbaijan," was ready "for any collaboration in moving currency as well as adjusting the rate of exchange under the direct supervision of the honorable economic agents of the government."

86.     In early 2012, Zarrab approached senior executives at Halkbank to discuss ways to facilitate access to NIOC money held in Halkbank accounts. Zarrab proposed using NIOC money to purchase gold. Recognizing the illegality of the scheme, Halkbank's general manager, Suleyman Aslan, initially refused. Zarrab responded by bribing the Turkish minister of the economy, Zafer Caglayan, to help broker the transaction with Halkbank and to prevent scrutiny from the Turkish government.

87.     With Caglayan's blessing, Halkbank assisted Zarrab in carrying out the gold scheme. Thus, under instruction from Aslan, Halkbank deputy general manager Atilla showed Zarrab how to prepare documents masking his transactions and concealing their illicit connections to NIOC and its affiliates. Atilla provided coaching about how Zarrab should fill out

required paperwork to give the appearance of compliance with sanctions laws—even though the underlying transactions at all times violated U.S. sanctions.

88.     With Halkbank's coaching, Zarrab prepared falsified documents stating that the gold sales were for the benefit of private Iranian companies (as opposed to IRGC fronts); other times, Zarrab prepared documents falsely stating that the gold was being repatriated to Iran (which was permissible under a then-existing loophole that permitted the proceeds of oil to be used to purchase goods that traveled back to Iran). In fact, the gold was being converted to cash in Dubai for the benefit of the IRGC front NIOC.

89.     Halkbank knew how the entire scheme worked. In an e-mail sent on June 20, 2012, Halkbank executive Levent Balkan, who headed Halkbank's foreign operations department, told Aslan and other colleagues that "the gold, which is left in Dubai, can be used in all kinds of foreign payments of Iran, either in gold or in foreign currency. The fact that these gold deposits are collected in the various fiduciary accounts and used for international payments of the forbidden Iranian banks in Dubai (such as Bank Melli, Bank Saderat), or Bank Mellat in Turkey. The gold transaction volume has reached remarkable dimensions in terms of international Iran sanctions."

90.     In fact, Balkan's involvement went beyond mere knowledge. According to public reports that surfaced in 2017, Balkan was "the key operative in assembling a team and setting up clandestine schemes on behalf of [the IRGC] in moving funds through Turkey." [69] Thus, wiretaps recorded on June 18, 2013 revealed that Balkan was "intimately involved with Seyed Ali Ekber Mir Vakili, an IRGC general and pointman who was responsible for [the IRGC's]

---

[69] Abdullah Bozkurt, *US-indicted Turkish banker's ties to Iran's IRGC ensnare Greece*, Turkish Minute (Nov. 19, 2017).

covert operations in Turkey."[70] These individuals discussed "how they could set up new schemes using several Turkish banks to continue moving IRGC funds through Turkey after the US imposed further restrictions on Iran, especially on companies affiliated with the IRGC."[71] "Thinking that they were secure in the car and that nobody was eavesdropping on their conversation, they were speaking quite openly about the IRGC, the Grand Ayatollah and Iranian political leaders."[72] In the conversation, Balkan expressed sympathy toward the Iranian Revolution, and stated that he was "not an outsider, but rather an inside man."[73] In the conversation, Vakili urged Balkan to "focus on the technical aspects of the business he would be running to circumvent sanctions after gold trade was also placed under the sanctions regime by the US."[74] Thus, a senior Halkbank executive was conspiring directly with an IRGC-QF general to establish an IRGC money laundering operation through the bank. Additional wiretaps revealed that Balkan was complicit in facilitating IRGC transactions throughout his time at Halkbank.[75]

91.     Zarrab also arranged meetings at Halkbank with IRGC officials and IRGC-affiliated bank executives to discuss ways to increase the amount of the IRGC's oil proceeds that could be laundered through the scheme. For example, NIOC's finance director met with the IRGC's banks at Halkbank on or about October 4, 2012 to discuss ways to transfer oil revenue held in banks around the world to Halkbank so that more IRGC money could be laundered through the gold scheme. NIOC also requested that Halkbank make payments on its behalf

---

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *See* Abdullah Bozkurt, *JP Morgan and Kardemir Embroiled in Iran Sanctions-Busting Scandal at Halkbank*, Stockholm Center for Freedom (Nov. 22, 2017).

directly. Halkbank executives Aslan and Atilla refused to do so because such payments would have constituted detectable sanctions violations traceable to Halkbank; instead, they instructed NIOC to continue using Zarrab's gold laundering system. At all times, however, Aslan, Atilla, and Balkan were scheming to help NIOC and the IRGC evade U.S. sanctions as effectively as possible, with full knowledge of what they were doing and who they were doing it for.

92.     Halkbank also lied to the U.S. Treasury Department, including at in-person meetings with Treasury officials in Istanbul and in Washington, D.C. When data revealed a dramatic increase in Türkiye's gold exports in 2012, the Treasury Department grew suspicious that the Iranian government could be behind the transactions. High-ranking government officials—including David Cohen, who was Undersecretary for Terrorism and Financial Intelligence, and Adam Szubin, the head of OFAC—reached out to Halkbank specifically to advise it of the applicable sanctions, and of the need to comply. These officials traveled personally to Türkiye to discuss these issues with Halkbank executives, and also hosted meetings in Washington, D.C. with those same executives. The Halkbank executives—including Aslan and Atilla—repeatedly lied to the Treasury Department about what Halkbank was doing, insisting that the transactions were not for the benefit of the Iranian government. Atilla also promised that Halkbank would cease mediating gold transactions as of June 1, 2013 in order to comply with new sanctions against the direct or indirect sale or supply of gold to Iran—but Halkbank continued to do so for at least the rest of 2013. In a call in October 2013, Atilla again lied to OFAC director Szubin about Halkbank's ongoing role in gold transactions.

93.     In February and March of 2013, as U.S. anti-terrorism sanctions tightened around the gold scheme, Halkbank and Zarrab designed an alternative mechanism to launder the IRGC's oil money through NIOC. Instead of executing gold trades and lying about where the gold was

headed, Defendants fabricated entirely fake food trades to exploit a humanitarian exception that allowed Iran to use oil money to purchase food and medicine for its people. The scheme was conceived by Zarrab and Aslan, and implemented with help from Atilla and Balkan. Under it, NIOC transferred funds to Zarrab's companies in Türkiye as payment for purported food sales, and Zarrab's companies transferred those funds to Zarrab's other companies in Dubai, which posed as food suppliers. Once in Dubai, the funds were used to fulfill NIOC's international payment requests. But no food was actually shipped. This scheme came online in July 2013.

94.     Deception was essential to the food scheme. Defendants thus collaborated to prepare fake documents creating the appearance of massive amounts of food sales, when in fact none were occurring. To make the system flow smoothly, Halkbank waived certain documentation requirements. For example, it did not require Zarrab to produce bills of lading, because bills of lading could be traced, and any tracing would have revealed that the underlying food transactions were fraudulent and exposed the entire scheme. Sometimes, when Zarrab's companies (which had never traded in food) made other mistakes in the documentation that threatened to expose the scheme (*e.g.*, representing that more food had been transported than a ship could realistically hold, or representing that a ship had made an unrealistic number of voyages in a given time period), Halkbank executives (usually Atilla) would coach Zarrab and his employees about ways to make the documents appear more legitimate.

95.     The United States government estimated that Zarrab and Halkbank transferred approximately $1.5 billion worth of currency from Halkbank to Dubai using fake food transactions between July and December 2013.

96.     In December 2013, the Turkish police arrested Zarrab, Aslan, and others in connection with this scheme. But Zarrab paid bribes to secure release for himself and his co-defendants in February 2014.

97.     Naturally, the arrests drew attention in Türkiye and in America. On December 23, 2013, Halkbank's board of directors sought to resolve that attention by unequivocally—and falsely—proclaiming its compliance with the law. Thus, the board of directors made a public announcement, posted to the "Material Events" tab of the "Investor Relations" portion of Halkbank's website, where it decried "a number of unfair and unwarranted statements about Halkbank in the media in recent days." This document contained multiple false statements:

(a) The statement asserted that "it must be known that Halkbank, from the first day ever, has fully complied with national and international rules and regulations in all its business operations and transactions." That was false because Halkbank's conduct exposed it to secondary sanctions under CISADA and the ISFR, as well as other international sanctions on Iran and the IRGC.

(b) According to Halkbank, "[a]ll foreign trade transactions and money transfers are carried out in an open and transparent manner which can be monitored by the related authorities on the system." That was false because Halkbank was systematically helping Zarrab move money in ways designed to obscure the flow of funds and evade regulatory scrutiny.

(c) Halkbank also proclaimed that "[t]he Bank has never become a party to any commercial activity, the nature of which is unknown or which is lawless and has never executed any transfer of unidentified origin or nature." That was false because Halkbank's transactions for the IRGC front NIOC were lawless.

(d) Halkbank stated that "[t]he intermediation services offered by Halkbank for the trade with Iran has been realized fully within the framework explained above. This trade activity is confined to the payments for the crude oil and natural gas imports of our country from Iran as well as the payments covering the proceeds of goods or services exported to Iran which are not subject to sanctions. As mentioned earlier the source and usage of the funds utilized for these payments as well as the parties to the foreign trade are clear, transparent, and traceable on the system." That was false because the payments for NIOC and Bank Markazi were not used exclusively for those purposes, and they were masked to make them difficult to trace.

(e) Halkbank further stated that "[i]n respect of the trade between Turkey and Iran . . . the Bank has requested all documents from its customers that it is legally obliged to demand and examine, checked them in accordance with the regulations and kept them available and ready for audit." That was misleading because Halkbank had knowingly helped Zarrab falsify documents.

(f) The statement also reiterated the previous lie that transactions involving precious metals to Iran had "ceased as of June 10, 2013," when in fact that transactions continued until closer to the end of 2013.

(g) The statement concluded definitively that "Halkbank has neither engaged in any business or transaction that violates any national or international rule or regulation, nor has the legal entity of Halkbank been subjected to any probe or investigation initiated by the law enforcement officers or the courts." That was false because many of Halkbank's transactions violated international sanctions, including U.S. anti-terrorism sanctions.

Notwithstanding these many false statements, the Board declared that it had "spent all the necessary efforts to obtain complete and accurate information" about this matter, and that it was "responsible for all statements made in this regard." These statements had the purpose and effect of concealing the scheme from outside scrutiny.

98.     Once the scrutiny had calmed after their release, Zarrab and Halkbank (still including Atilla, as well as a new general manager, Ali Fuat Taskinoglu) resumed their illicit food and gold transactions. The Turkish case was dismissed in October 2014 because of more bribe payments.

99.     To shield the new trades from scrutiny, Halkbank began requiring additional documents from Zarrab (for example certificates of inspection for goods), but again coached Zarrab to prepare those documents to look legitimate, even though the underlying transactions were fictitious.

100.    The Treasury Department also asked Halkbank executives directly about the scope of the bank's dealings with Zarrab. In response, Atilla lied about the scope of Zarrab's business, describing him as the recipient of some bank loans and involved in unspecified foreign trade, never mentioning Zarrab's gold and food export schemes.

101.    Defendants' illicit transactions with the IRGC continued until March of 2016, when Zarrab was arrested by U.S. authorities while visiting Miami, Florida. Zarrab pleaded guilty to various offenses arising out of this alleged conduct in 2017. Atilla was arrested in March of 2017; Zarrab testified for the government at Atilla's trial; and Atilla was convicted in early 2018 of several federal offenses arising out of the alleged conduct. Halkbank was indicted in 2019; the criminal case against it is ongoing. Other Halkbank officers, including Aslan and Balkan, were also indicted, but remain fugitives.

102.    The United States government alleged that through the means described above, Halkbank illicitly transferred approximately $20 billion worth of otherwise restricted Iranian funds to the IRGC, and that senior Halkbank officers acting within the scope of their employment and for the benefit of Halkbank concealed the true nature of these transactions from U.S. Treasury Department officials so that Halkbank could supply billions of dollars to the IRGC through NIOC and its affiliates without being sanctioned by the United States and losing its ability to hold correspondent accounts with U.S. financial institutions.

103.    Some independent analysts put the number far higher. According to money laundering expert and former U.S. government investigator John Cassara, for example, "Turkey's state-owned Halkbank" was "part of" a "conspiracy … of engaging in a complex TBML scheme where gold and cash was routed from Turkey to Iran through an elaborate network of businesses, banks, and front companies"; "It is estimated the money laundering and value transfer could have helped Iran pocket more than $100 billion! This could be one of the largest — if not the largest — money laundering case in history."[76]

**C.**    **At All Relevant Times, the National Iranian Oil Company Was a Known Front for the IRGC, Which Used and Uses Oil Revenue to Promote Terrorism**

104.    By the time Defendants' unlawful scheme to launder NIOC's frozen funds began in 2012, they knew that NIOC was a front for the IRGC, that a substantial amount of NIOC's revenue flowed through to the IRGC either directly or through contracts awarded to IRGC entities, and that the sanctions on NIOC were designed to prevent the IRGC from accessing oil revenue that it could use to promote anti-American terrorism. Indeed, the media and U.S.

---

[76] John A. Cassara, *Money Laundering and Illicit Financial Flows: Following the Money and Value Trails* 85-86 (2020).

authorities had explicitly warned businesses worldwide that transacting with NIOC created unacceptable risks of promoting the IRGC's terrorism. Consequently, Defendants knew that they were subsidizing the IRGC's worldwide support for terrorism.

105.    On April 26, 2010, IHS Global Insight reported that IRGC companies were "increasingly being awarded tenders by NIOC and its subsidiaries . . . creating potential significant problems for . . . foreign firms" dealing with NIOC and its subsidiaries "given the specific international sanctions against dealing with Revolutionary Guards affiliates and the U.S. classification of the outfit as a terrorist organisation."

106.    Around the same time, multiple media sources reported that the Ministry of Petroleum had awarded the IRGC's engineering company, Khatam al-Anbiya, multi-billion dollar contracts to develop a major gas field in Iran. As explained *supra*, the Treasury Department sanctioned Khatam al-Anbiya and Rostam Ghasemi in February 2010, again highlighting that the IRGC was controlled substantial parts of Iran's oil industry, and explicitly noting that "[t]he profits from these activities are available to support the full range of the IRGC's illicit activities, including . . . support for terrorism."[77]

107.    In August 2011, Ghasemi was appointed Minister of Petroleum, taking control of the agency that in turn controls NIOC. Public sources reported that General Ghasemi was "under US and EU sanctions."[78] The same article reported that General Ghasemi, speaking in parliament, described himself as a "soldier[] of the Islamic Republic's Revolutionary Guards."[79] President Ahmadinejad similarly described Ghasemi as a "child of the revolution," who would

---

[77] Press Release, *supra* n.21.

[78] *Iran's Parliament Approves New Oil Minister*, Al Jazeera (Aug. 3, 2011), https://www.aljazeera.com/news/2011/8/3/irans-parliament-approves-new-oil-minister.

[79] *Id.*

43

"transform" the oil industry "in line with national interests."[80] Ghasemi's confirmation to the post was accordingly "a defiant message to Iran's foes"—specifically, as one Iranian lawmaker explained, so that Western nations "do not think that when they impose sanctions parliament will pay any attention."[81]

108. Ghasemi was personally involved in the IRGC's sanctions-evasion and money-laundering scheme in this case: Zarrab testified that Ghasemi attended a meeting in May 2013, along with other high-level Iranian officials (including high-level individuals from NIOC and its affiliates) as well as Aslan, where Iranian officials asked Halkbank to also launder money from other banks around the world, and to allow NIOC to make direct payments to third parties in violation of sanctions.

109. An article published in early 2012 by Ali Alfoneh, a fellow at the American Enterprise Institute, entitled *Iran's Revolutionary Guards Strike Oil*, explained that Ghasemi's appointment was tantamount to "the IRGC's seizure of the Oil Ministry," which "could have far reaching economic, political, and strategic implications."[82] The article opined that for Ghasemi, "the interests of the IRGC outweigh the interests of the Iranian state," and that "[t]he IRGC lobbied hard for the candidacy of [Ghasemi]," in part so that the IRGC could achieve "its main goal: access to Iran's foreign exchange reserve," *i.e.*, Iran's oil revenue.[83]

---

[80] Robin Pomeroy, Ramin Mostafavi, *Military Officer Becomes Iran's New Oil Minister*, Reuters (Aug. 3, 2011), https://www.reuters.com/article/iran-oil-minister-vote-idAFL6E7J31E020110803.

[81] *Id.*

[82] Ali Alfoneh, *Iran's Revolutionary Guards Strike Oil*, AEI (Feb. 16, 2012), https://www.aei.org/articles/irans-revolutionary-guards-strike-oil/.

[83] *Id.*

110.     On November 15, 2011, Mark Dubowitz, president of the Foundation for Defense of Democracies, testified in front of the House Subcommittee on National Security, Homeland Defense, and Foreign Operations. Dubowitz advocated for stronger sanctions against Iran, specifically targeting the IRGC's control of the oil industry. Dubowitz testified that the IRGC was "unquestionably the dominant force throughout Iran's energy sector, including the sale of Iran's oil," and that "the United States should also consider designating Iran's state-owned National Iranian Oil Company (NIOC). NIOC is a party to every Iranian oil transaction. Leveraging its position as a state-owned institution, NIOC operates as the ultimate front company in obscuring the role of the IRGC in the oil trade."[84] Dubowitz further testified that "[t]he Central Bank of Iran, like the National Iranian Oil Company, and other IRGC entities discussed above—are critical links in the IRGC-dominated oil supply chain and key enablers of the IRGC's proliferation activities, terrorist operations and human rights abuses."[85]

111.     Also in November 2011, UANI publicly called on Italian energy company Edison SpA to stop doing business in Iran. In its appeal, UANI stated that "[t]he IRGC is a known terrorist entity in control of Iran's oil, gas, and petrochemical sectors. . . . The IRGC also 'bankrolls' groups in Iraq and Afghanistan that execute attacks against American and NATO servicemen. . . . By working with NIOC and the IRGC to develop Iran's oil sector, Edison is directly contributing to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs."[86]

---

[84] Dubowitz, *supra* n.66, at 8-9.

[85] *Id*. at 15.

[86] United Against Nuclear Iran, Open Letter to Giuliano Zuccoli (Nov. 29, 2011), https://www.unitedagainstnucleariran.com/sites/default/files/IBR%20Correspondence/UANI_Letter_to_Edison_112911.pdf. This letter was publicized in the press, including in publications like Business Wire. *See supra* n.67.

112.    These public disclosures were part of a larger public discourse about the role that Iran's petroleum sector, and NIOC specifically, played in the IRGC's support for terrorism. Based on these and similar sources, the U.S. government stepped up its sanctions targeting the IRGC's use of Iranian petroleum exports, including imposing specific sanctions on businesses providing services to NIOC, as well as secondary sanctions on foreign financial institutions.

113.    In August 2012, Congress enacted the ITRSHRA. Section 312 expressed "the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates." 126 Stat. 1249. The statute specifically ordered the Secretary of the Treasury to determine within 45 days whether NIOC was an agent or affiliate of the IRGC, and to impose additional sanctions under CISADA and the ISFR if the answer was "yes."

114.    In September 2012, the Treasury Department presented a report to Congress concluding that NIOC was an agent or affiliate of the IRGC. Although full details of the report were not published, the bottom-line conclusion was. The Treasury Department publicly announced that that "the IRGC's influence has grown within NIOC" under the current regime, and that "the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions."[87]

115.    Reacting to the Treasury Department's determination, Dubowitz publicly commented that "U.S. law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization,"[88] *i.e.*, the IRGC.

_____

[87] Press Release, *supra* n.30.

[88] Press Release, *supra* n.68.

116.     Over time, information linking NIOC and its subsidiaries to the IRGC only became more robust. Thus, in 2013, the Treasury Department designated Iranian businessman Babak Morteza Zanjani as well as NIOC's affiliate the Naftiran Intertrade Company Ltd. ("NICO") for their connection to NIOC.

117.     Those entities both did business with Zarrab. Zarrab himself testified in Atilla's criminal trial that Zanjani sent 1.5 tons of gold for Zarrab to move. Subsequent news reports indicated that the relationship was far deeper than just a single gold shipment: According to one of Zarrab's gold haulers, "Zanjani and Zarrab were partners in every work."[89]

118.     Zarrab also testified that he often dealt with NICO executives because NICO was "a front company" that "had more range of movement, in terms of its authority to make decisions," than NIOC. Zarrab testified that the distinction did not matter because "NICO and NIOC are one and the same," and that NICO executives attended meetings to establish the laundering scheme for NIOC's funds.

119.     Sanctions against NIOC were temporarily lifted in 2016 as part of what is commonly described as the "Iran nuclear deal." Those sanctions were subsequently reimposed during the Trump administration, which clarified that NIOC's involvement in terrorism had persisted. A slew of reports from 2018 to 2020 showed that the IRGC-QF used NIOC to sell oil around the world, generating funds that the IRGC-QF could use to support terrorism abroad.

120.     On January 23, 2020, OFAC described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary

---

[89] Tom Stocks et al., *'The Government Is In on It': An Insider's Account of the Reza Zarrab Conspiracy*, Organized Crime and Corruption Reporting Project (Sept. 20, 2020), https://www.occrp.org/en/the-fincen-files/the-government-is-in-on-it-an-insiders-account-of-the-reza-zarrab-conspiracy.

Guard Corps – Qods Force (IRGC-QF) and its terrorist proxies."[90] In that same release, the Treasury Secretary commented that "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities."[91]

121.    October 26, 2020, OFAC designated the Iranian Ministry of Petroleum, NICO and the National Iranian Tanker Company "for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)."[92] The government observed that "[t]he cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF."[93] The Secretary of the Treasury himself commented that "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF."[94]

122.    Although some of these statements were published after the attacks in this case took place, they described a consistent pattern of conduct that existed at all relevant times throughout Defendants' scheme with the IRGC. These sources show that NIOC was closely intertwined with terrorist violence because the IRGC used revenues from NIOC oil sales to finance terrorist attacks.

---

[90] U.S. Dep't of the Treasury, Press Release, *Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries* (Jan. 23, 2020), https://home.treasury.gov/news/press-releases/sm885.

[91] *Id.*

[92] U.S. Dep't of the Treasury, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force* (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[93] *Id.*

[94] *Id.*

### D.   The IRGC Used the National Iranian Oil Company's Assets to Sponsor Terrorist Attacks on Americans Through Proxies in Afghanistan and Syria

123.    At all times relevant to the allegations herein, the IRGC was leading an international terrorist conspiracy. The object of the conspiracy was to expel the United States from the Middle East, including Afghanistan and Syria. That objective was foundational to the IRGC, which regards the United States as the "Great Satan," and believes that the United States' presence anywhere in the Middle East is contrary to the interests of the Iranian Revolution.

124.    Participants in the conspiracy included, but were not limited to, three IRGC entities (the Regular IRGC, the IRGC-QF, and Hezbollah), various IRGC fronts (including NIOC), and allied terrorist groups. In Afghanistan, this included al-Qaeda and the Taliban, including its Haqqani Network. In Syria, this included al-Qaeda, al-Qaeda-in-Iraq, and al-Nusra Front.

125.    Anti-American purpose was strongly shared as between the IRGC (a Shiite organization) and the syndicate groups in Afghanistan (Sunni organizations). These groups share relatively little common ground, except for their desire to inflict casualties on the United States and expel the United States from the Middle East. The support the IRGC provided to syndicate terrorists in Afghanistan was specifically designed to promote that goal.

126.    The Treasury Department noted the IRGC-QF's support for the Taliban when it designated the IRGC-QF an SDGT in 2007. As the Treasury Department explained, the support included weapons and financial support specifically intended to inflict casualties on U.S. and NATO forces. *See supra* ¶ 68.

127.    That support continued over the subsequent years, In June 2008, the Treasury Department explained that "[t]he Qods Force, designated under E.O. 13224 for providing material support to terrorists, is the regime's primary mechanism for cultivating and supporting

terrorists and Islamic militants to advance Iranian national interests. The Qods Force provides training, weapons, and financial support to surrogate groups and terrorist organizations including . . . the Taliban and Islamic militants in Afghanistan . . . The Qods Force plays a central—yet often hidden—role in security interests, including Iraq and Afghanistan. Qods Force officers often use various cover mechanisms—including diplomatic, non-governmental organization, humanitarian, and media—for conducting operational activity, belying their military affiliation."[95]

128.    On August 3, 2010, the Treasury Department reiterated that "[t]he IRGC-QF is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia."[96] The government was explicit that "[i]n Afghanistan, the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."[97]

129.    The District Court for the District of Columbia found in *Cabrera* that the IRGC provides substantial support to the syndicate. There, the court, after considering expert testimony and reports on the subject, recognized that "the IRGC is the primary driver of Iran's terror activities," and that "its support for terrorism is foundational and institutional."[98] This includes partnering with "groups (like the Taliban in Afghanistan) that share its goals of expelling the

---

[95] U.S. Dep't of the Treasury, Press Release, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency* (Jan. 9, 2008), https://home.treasury.gov/news/press-releases/hp759.

[96] Fact Sheet, *supra* n.54.

[97] *Id.*

[98] *Cabrera*, 2022 WL 2817730, at *9 (cleaned up).

United States and reinstating the Islamic Emirate."[99] "Iran's support significantly contributed to the Syndicate's success in" "end[ing] the American and Coalition occupation by killing and wounding American soldiers."[100] And "Iran's support was fungible: although Iran, the IRGC, and the Qods Force may not have been involved in the details of individual attacks, the money, training, weapons, and expertise Iran provided were critical to the Syndicate's success."[101] This "cross-cutting organizational support" allowed Iran to "substantially contribute[]" to terrorist attacks on Americans in Afghanistan. [102]

130.    The IRGC provided vital financial, operational, and logistical aid to al-Qaeda core, which allowed the latter to provide direct assistance to al-Qaeda's operatives in Iraq and Syria from 2003 through 2013. "Osama bin Laden" himself "described" the Iranian aid facilitated by the IRGC "as al-Qaeda's 'main artery for funds, personnel, and communication.'"[103]

131.    The U.S. government concurred. In July 2011, the Treasury Department publicly stated "that Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan," and "the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia."[104] Treasury Assistant Secretary Daniel L. Glaser testified in September 2011 that one of the Treasury Department's

---

[99] *Id.* at *10.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] U.S. Dep't of Treasury, Press Release, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011), https://home.treasury.gov/news/press-releases/tg1261.

51

"most important acts against Iranian state sponsorship occurred just two months ago when we, for the first time ever, exposed Iran's secret agreement with al-Qa'ida members, which allows al-Qa'ida to funnel funds and operatives through Iranian territory."[105]

132.    Similarly, the District Court in *Cabrera* found that the IRGC "share[d] a close relationship with al-Qaeda," and "supported al-Qaeda's activities around the world."[106] "After the September 11 attacks, Iran and al-Qaeda had a 'secret deal' that Iran would serve as al-Qaeda's base of operations and provide safe haven for al-Qaeda terrorists and their families who were driven from Afghanistan."[107] "The same close relationship extended to al-Qaeda's operations in Afghanistan: Iran's support of al-Qaeda allowed it to exist insulated from the pressures of American and Coalition forces in Afghanistan and, in turn, al-Qaeda provided tactical and operational support to the Syndicate [of terrorist groups that included the Taliban, including its Haqqani Network] in Afghanistan."[108]

133.    Through al-Qaeda's same IRGC-provided "main artery," the IRGC powered al-Qaeda's attacks in Iraq and Syria just like the IRGC enabled al-Qaeda's attacks in Afghanistan and Pakistan. The IRGC, directly and through its alliance with al-Qaeda, provided AQI and ANF with essential financial, operational, and logistical aid that allowed AQI and ANF to successfully target Americans in Iraq and Syria.

134.    For example, in 2011, the U.S. Department of the Treasury publicly concluded that the IRGC operationalized Iran's secret deal with al-Qaeda, which enabled al-Qaeda's,

---

[105] U.S. Dep't of Treasury, Press Release, *Written Testimony of Treasury Assistant Secretary Daniel L. Glaser before the House Financial Services Subcommittee on Oversight and Investigations* (Sept. 6, 2011), https://home.treasury.gov/news/press-releases/tg1287.

[106] *Cabrera*, 2022 WL 2817730, at *10 (cleaned up).

[107] *Id.*

[108] *Id.*

including al-Qaeda-in-Iraq's, transnational logistics, fighters, finances, and weapons to move unimpeded from Syria and Iraq all the way through ton Afghanistan and Pakistan, with the IRGC serving as al-Qaeda's, including al-Qaeda-in-Iraq's, bridge between Iraq/Syria and Afghanistan/Pakistan.[109]

135.    Other U.S. government findings confirmed these points. In 2012, for example, the Treasury Department designated the Iranian Ministry of Intelligence and Security an SDGT in part "for its support to terrorist groups, including al Qa'ida, al Qa'ida in Iraq, Hizballah and HAMAS, again exposing the extent of Iran's sponsorship of terrorism as a matter of Iranian state policy,"[110] which MOIS pursued through its collaboration with the IRGC. And in 2014, the Treasury Department publicly confirmed that the IRGC's aid to al-Qaeda allowed "al-Qa'ida's Network in Iran" to "mov[e] funding and foreign fighters through Turkey to support al-Qa'ida-affiliated elements in Syria, including the al-Nusrah Front."[111]

## II.    DEFENDANTS WERE GENERALLY AWARE THAT THEY WERE PLAYING A ROLE IN ILLEGAL ACTIVITY THAT FORESEEABLY RISKED TERRORISM

### A.    Defendants Knew That They Were Playing a Role in Illegal Activity, and Willingly Joined the IRGC's Conspiracy

136.    Defendants knew at all times that by laundering vast sums of money for the IRGC and its fronts, they were playing a role in illegal activity.

---

[109] Press Release, *supra* n.104.

[110] U.S. Dep't of Treasury, Press Release, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://home.treasury.gov/news/press-releases/tg1424.

[111] U.S. Dep't of Treasury, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014), https://home.treasury.gov/news/press-releases/jl2287. The IRGC comprised the primary referenced Iranian government actor in this designation.

137.    Zarrab understood from the inception of the scheme that he was participating in "economic jihad" by helping the IRGC evade sanctions. Indeed, he proposed the scheme to President Ahmadinejad and to the head of Bank Markazi as a way to help evade sanctions using his family's expertise in currency exchange in aid of the IRGC. From the very beginning, then, Zarrab knew that he was helping the IRGC evade anti-terrorism sanctions, and agreed to do so.

138.    Zarrab commenced the scheme by paying bribes to Turkish officials to allow him to access NIOC funds—actions that show Zarrab's consciousness of guilt and willingness to break the law to assist terrorists.

139.    On one occasion, on May 6, 2013, NIOC accidentally attempted to transfer approximately 70 million Turkish Lira directly to one of Zarrab's accounts. Zarrab demanded that the bank not execute the transfer because any direct transfer between NIOC and his companies would raise suspicion and result in the exposure of his scheme. As Zarrab testified at Atilla's trial, the transfer was a mistake "[b]ecause of the rules and regulations of the United States, and United Nations, I could not receive . . . [g]as or oil money directly to my account." Zarrab elaborated that "they could not send it to me because of the sanctions, regulations and rules. If they would be able to send it to me, they could also be able to make their own foreign payments in the world." This incident, and Zarrab's subsequent description of it, shows that Zarrab knew at the time that he was structuring transactions to evade anti-terrorism sanctions, knew that the purpose of the sanctions was to stop NIOC from accessing international financial markets, and knew that the transactions he was executing were unlawful.

140.    Zarrab also met directly with IRGC agents to discuss ways to launder their money. At these meetings, Zarrab learned, if he did not already know, that he was laundering money for the IRGC.

54

141.    The deceptive nature of the schemes was such that Defendants would have understood they were unlawful. The gold scheme required defendants to tell a series of lies about the parties who benefited from the gold transactions as well as the destination of the gold, and to prepare false documents embodying those lies. The food scheme required equally brazen lies, *i.e.*, representations that food shipments were taking place when none were in fact occurring. These lies were necessary—and Defendants told them—because Defendants knew the identity of their ultimate counterparty (*i.e.*, the IRGC and its terrorist proxies) and knew that the true nature of their transactions was unlawful.

142.    Zarrab and several Halkbank executives were arrested by Turkish police in 2013, escaping only because Zarrab paid more bribes to Turkish authorities. This arrest established again that Defendants' conduct was illegal. But rather than cease the misconduct, Zarrab and Halkbank resumed it immediately upon Zarrab's release from prison—indeed, even before the Turkish charges were dismissed. The arrest, the bribes, and the resumption of culpable activity all show that Defendants knew that their conduct was illegal.

143.    Ultimately, Zarrab pleaded guilty to criminal offenses including sanctions violations, bank fraud, and money laundering—all of which have *mens rea* elements, admitting that he knew at the time that he was playing a role in illegal activity.

144.    Halkbank executives, including Aslan, Atilla, and Balkan, also knew that their conduct was illegal. Aslan initially refused to start the scheme because he knew it was illegal, and only agreed to do so after receiving assurances from the (bribed) Turkish minister of the economy. Aslan himself then accepted bribes from Zarrab to start up and maintain the scheme, which were only necessary because the scheme was illegal. Aslan was also charged by Turkish

authorities for his role in the scheme, and later indicted by the United States. All of these events show that Aslan knew, at all times, that the sanctions evasion scheme was unlawful.

145.    Atilla structured transactions to evade sanctions detection—an act that was only necessary because Atilla understood that the transactions were illegal. U.S. government officials David Cohen and Adam Szubin testified that when they met with Atilla, they received assurances that Halkbank understood the sanctions and were complying with them. Indeed, on February 12, 2013, Szubin specifically pulled Atilla aside after their meeting to explain, in no uncertain terms, that the Treasury Department had concerns about Halkbank, and that Halkbank's compliance with the sanctions laws was essential. Atilla responded that Halkbank understood and would follow the law.

146.    Atilla understood the sanctions laws—including their purposes and requirements—but instead of using his knowledge to promote compliance, he used it to advise Zarrab about how to better evade those laws. To that end, Atilla devised ways for Zarrab to prepare false documents misrepresenting the nature of his gold and food transactions, and coached Zarrab in the preparation of these documents so that they appeared more realistic and were therefore less likely to draw regulatory scrutiny.

147.    Ultimately, a U.S. jury convicted Atilla of conspiracy to defraud the United States, conspiracy to violate sanctions laws, bank fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering. These offenses require the defendant to have acted knowingly. The jury's verdict thus establishes that Atilla acted knowingly.

148.    Balkan met with an IRGC general to help put the scheme in place, and described himself as an "inside man" for the IRGC. He also penned an e-mail noting that the gold scheme was moving tremendous sums of money in violation of Iranian sanctions. These facts show that

Balkan, on behalf of Halkbank, acted knowingly at all times—and conspired directly with IRGC officials to further the IRGC's global agenda.

149.    Ali Fuat Taskinoglu likewise understood that Halkbank's conduct was illegal, as he approved resumption of the scheme after Zarrab and his co-conspirators had been arrested by Turkish authorities.

150.    At all times, Aslan, Atilla, Balkan, and other Halkbank executives were acting within the scope of their employment at Halkbank, and their knowledge of their actions, including those actions' illegality, is fairly imputed to Halkbank.

### B.    The Illegal Activity Defendants Participated in Foreseeably Risked Terrorist Attacks on Americans

151.    The terrorist attacks that injured Plaintiffs were natural and foreseeable consequences of the massive sanctions-busting scheme Defendants perpetrated, and were acts in furtherance of the conspiracy Defendants joined.

152.    The immediate consequence of Defendants' conduct is that NIOC's revenues from its oil sales in Türkiye, which U.S. anti-terrorism sanctions had previously frozen, were exported from Türkiye to Dubai, where they could be changed into any currency and forwarded on to make payments all over the world. The clear beneficiary of this scheme was any entity that gained access to NIOC's previously frozen revenues.

153.    The public sources cited *supra* establish that this beneficiary was, in fact, the IRGC. Congress publicly expressed that NIOC was an IRGC agent or affiliate, *i.e.*, front, in August 2012, and the Treasury Department verified that fact a month later. Other public sources revealed even before that time that the IRGC was using Iran's oil revenue to fund terrorists. The 2007 designation of the IRGC noted that the IRGC "has numerous economic interests involving defense production, construction, and the oil industry," and noted that IRGC company Khatam

al-Anbiya had "secured deals worth at least $7 billion in the oil, gas, and transportation sectors."[112] The February 2010 designation of Khatam al-Anbiya and Rostam Ghasemi noted that the profits from the IRGC's control of the oil industry were "available to support the full range of the IRGC's illicit activities, including WMD proliferation and support for terrorism."[113] On December 21, 2010, the Treasury Department noted that the IRGC was "a primary focus of U.S. and international sanctions against Iran because of . . . its support for terrorism," and that the IRGC had "expanding influence and control over broader segments of the Iranian economy," including the "oil and gas industries."[114] And on June 23, 2011, the Treasury Department explained that the IRGC used its presence in Iran's economic infrastructure "to generate revenue and conduct business in support of Iran's illicit activities," and that "imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct."[115]

154.    These public sources established that the IRGC was using oil revenue to support terrorism. But they weren't even necessary because anybody with even a passing familiarity with the IRGC would know that the IRGC was, by its very nature, not a peaceful industrial organization, but instead a terrorist organization—and therefore would know that the IRGC's participation in Iran's commercial sector and oil industry was a means to obtain resources to support acts of terrorism.

155.    It was also known at the time that the IRGC's support for terrorism specifically included aiding al-Qaeda and the Taliban in their attacks against American and Coalition forces

---

[112] Fact Sheet, *supra* n.9.

[113] Press Release, *supra* n.21.

[114] Fact Sheet, *supra* n.23.

[115] Fact Sheet, *supra* n.59.

in Afghanistan by providing money, training, weapons, and safe haven to terrorists engaged in

such attacks. Thus, as of 2007, the IRGC-QF had specifically been designated as an SDGT under

Executive Order 13224 because it was supporting terrorist groups including the Taliban in

Afghanistan.[116] In January 2008, the Treasury Department explained that the Qods Force "is the

regime's primary mechanism for cultivating and supporting terrorists and Islamic militants to

advance Iranian national interests," and that it does so by providing "training, weapons, and

financial support to surrogate groups and terrorist organizations" including "the Taliban and

Islamic militants in Afghanistan."[117]

156.    It was equally foreseeable that aiding the IRGC would support other terrorist

organizations, including al-Qaeda and its branches in Syria and Iraq. Thus, according to the U.S.

State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the

Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating

and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training,

and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based

militants, and Taliban fighters in Afghanistan."[118] Multiple terrorism experts had published

articles confirming this fact.

157.    The nature of the laws Defendants violated also made terrorism a foreseeable

consequence of those violations. As Professor Jimmy Gurulé explained in his 2010 book,

"[s]ince the September 11, 2001 terror attacks, one of the U.S. Government's top goals in the

Global War on Terror has been to deprive the terrorists of funding and dismantle their financial

---

[116] *See* Fact Sheet, *supra* n.9.

[117] Press Release, *supra* n.95.

[118] U.S. Dep't of State, *Country Reports on Terrorism 2008* (Apr. 30, 2009), https://2009-2017.state.gov/j/ct/rls/crt/2008/122436.htm.

networks. To accomplish these objectives, the Administration has emphasized criminal enforcement actions and freezing the assets of suspected terrorists and their financial supporters."[119] The sanctions preventing Iran and the IRGC from accessing its oil revenues in Türkiye were part of this effort to curb terrorist finance.

158.    Defendants violated U.S. sanctions directly targeting the IRGC and IRGC-QF, which were specifically designed to curb the IRGC's support for terrorism against Americans. It is axiomatic that terrorism against Americans is a natural and foreseeable consequence of violating a law designed to stop terrorism against Americans. To conclude otherwise requires accepting that the law does not have any rational relationship to its stated purpose.

159.    It is similarly axiomatic that agreeing to launder money for organizations like the IRGC and the IRGC-QF, in order to help those organizations pursue their global foreign policy agenda—which included regular acts of terrorism targeting the United States in order to coerce the U.S. government in Washington, D.C. to change policy and withdraw from the Middle East—is a conspiracy with clear linkages to terrorist attacks on Americans. The attacks were accordingly acts in furtherance of the conspiracy Defendants joined.

## III.    DEFENDANTS KNOWINGLY AND SUBSTANTIALLY ASSISTED TERRORIST ATTACKS

160.    Defendants' support was "knowing" because it was not provided innocently, inadvertently, or accidentally—and because Defendants knew that by providing the assistance they provided, they assisted the violent activities of the IRGC's terrorist proxies. As alleged *supra*, Defendants intentionally commenced, pursued, refined, and concealed a scheme to launder NIOC's oil revenues, knowing that they were laundering money that would flow to the

---

[119] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 324 (2010).

IRGC, and through to the IRGC's terrorist proxies. Defendants thus knew what they were doing, and knew who they were doing it for.

161.    In evaluating whether Defendants' support was "substantial," courts consider six factors, including the nature of the act assisted, the amount and type of assistance provided, the defendant's presence at the time of the tort, the defendant's relationship to the tortfeasor, the defendant's state of mind, and the duration of the assistance. The purpose of the six-factor inquiry is to determine whether the defendant's participation was conscious and culpable. These factors collectively weigh in favor of finding that Defendants' support was substantial.

162.    **Nature of the Act Assisted.** Defendants assisted terrorist finance, and therefore terrorist attacks. Terrorist attacks against Americans, who are generally well-protected, require planning and resources to commit. Defendants' support enabled the terrorists to access both. As alleged *supra*, the IRGC supplied al-Qaeda, the Taliban, al-Qaeda-in-Iraq, and al-Nusra Front, among others, with resources including money, weapons, technology, training, and safe haven. These resources were intended to facilitate, and did facilitate, the planning and commission of terrorist attacks on Americans. And Defendants knew that by providing access to capital to the IRGC, they were facilitating such attacks.

163.    **Type and Amount of Support.** For the same reasons, the amount and type of assistance provided were substantial. Giving the IRGC access to cash that it could move freely was critical to the IRGC's ability to provide resources to violent terrorists. Banks like Halkbank knew this because it is a cornerstone of sound banking practices, as promulgated by organizations like the Financial Action Task Force (FATF), as well as the U.S. Treasury Department, that countering terrorist finance is critical to preventing terrorist violence. Indeed, that proposition is the fundamental premise of most sanctions on the IRGC and its fronts

(including NIOC). By helping the IRGC evade these sanctions, Defendants provided an especially culpable form of assistance with a clear nexus to terrorist violence.

164.    The amounts at issue were also significant, approaching $20 billion over a four-year period—and potentially as much as $100 billion, *see supra* ¶ 103. Even if only a small fraction of that value flowed through to terrorists, it was more than enough to fund each and every terrorist attack at issue in this case hundreds of times over because Al-Qaeda and its proxies, including the Taliban, were especially efficient at deploying the IRGC's resources. For example, one Department of Defense study determined that a contribution of about $2,700 to al-Qaeda's branch in Iraq was enough to finance one additional effective attack.[120] Similarly, al-Qaeda boasted that it could conduct a sophisticated transnational bombing attack targeting Americans in the Middle East for less than $5,000.

165.    Indeed, $20 billion was more than enough to finance every IRGC-enabled attack anywhere in the world that resulted in the death, serious physical injury, or hostage taking of an American worldwide from 2012 through 2020. Whether one applies the Pentagon's cost estimate (about $2,700 per attack) or that of al-Qaeda (about $5,000 per attack), Defendants' aid was equal to that need to fund well more than one million attacks.

166.    In addition to providing access to funds, Defendants provided the IRGC with the means to move its money covertly, without detection. Secrecy is essential to terrorist enterprises, and Defendants provided it.

---

[120] *See* Benjamin Bahney *et al.*, *An Economic Analysis of the Financial Records of al-Qa'ida in Iraq*, at 61-67 (2010), https://www.rand.org/pubs/monographs/MG1026.html. Although this study addressed AQI specifically, its findings are substantially applicable to the activities of al-Qaeda's branch in Syria (ANF) and affiliates in Afghanistan (the Taliban, including its Haqqani Network), which copied al-Qaeda's techniques and (in the case of ANF) inherited its resources.

167.    The timing of the assistance was also important. In 2012, when Defendants'
violations began, Iran's economy was reeling because the sanctions against it were working. The
IRGC, which depended on revenue from Iran's commercial sector, including its oil industry,
acutely needed covert ways to evade sanctions and access its funds. Defendants thus provided
critical support at a vital moment for the IRGC's global terror campaign.

168.    These facts, individually and together, establish that Defendants provided a type
and amount of assistance that establishes they behaved culpably vis-à-vis terrorist violence.

169.    **Presence.** Although Defendants were not present at the actual terrorist attacks,
their ability to move funds to Dubai was important to facilitating attacks. Public sources have
long confirmed that the U.A.E. served as a logistical, financial, and operational hub for the
IRGC's terrorist campaign. For example, as explained in *Reuters*, "[a]s the U.S. and EU
sanctions on Iran's oil and finance sectors in 2012 started to bite, the [IRGC] responded by
setting up complex operations involving the likes of Dubai …. 'The IRGC started to buy
hundreds of … companies around the [U.A.E.] to use as front companies,' said a trader involved
in … the oil industry. 'These companies partnered with some foreign companies to bypass
sanctions. Most of the time cash was delivered to a foreign account in a neighbouring
country.'"[121] Defendants were willing participants in that terrorist finance operation.

170.    Similarly, George W. Bush explained in a widely reported 2008 speech to U.A.E.
government and business leaders that illicit transactions in the U.A.E. were important to the
IRGC's ability to provide "support for Islamist groups and militants in Afghanistan, Iraq,

---

[121] Parisa Hafezi, *Iran's elite Guards to gain regional, economic power in post-sanctions era*,
Reuters (Jan. 19, 2016), https://www.reuters.com/article/us-iran-sanctions-guards-insight/irans-
elite-guards-to-gain-regional-economic-power-in-post-sanctions-era-idUSKCN0UX2M3
(emphasis added).

Lebanon and the Palestinian territories."[122] Press reports concerning President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."[123] Thus, Defendants did not merely provide support from afar; they allowed the IRGC to access a key geography by delivering resources there, and providing the infrastructure to move those resources on to conflict zones where they could be used to finance attacks against Americans.

171.    **Relationship.** The allegations here and the evidence in the criminal case show that Defendants worked directly with important officials who were central to the IRGC's terrorist enterprise, including Rostam Ghasemi and IRGC-QF officials. Defendants' relationship with the IRGC was accordingly direct, and their relationship with the IRGC's terrorist proxies was mediated only by the IRGC itself.

172.    The relationship was not a garden-variety, arms' length commercial relationship, but instead in the nature of a criminal agreement to help the IRGC obtain billions of dollars in frozen funds so that it could deploy those funds to achieve its objectives. Thus, the relationship had a culpable character.

173.    On the other hand, neither the IRGC nor its terrorist proxies had the sort of special relationship with Defendants that would provide those terrorists with undue influence or sway over Defendants' decisions, and thus mitigate Defendants' culpability.

174.    **State of Mind.** As alleged *supra*, Defendants' state of mind was culpable. Zarrab professed a desire to engage in "economic jihad" and help Iran thwart U.S. sanctions. He then

---

[122] APS Diplomat, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.

[123] *Id.*

designed and implemented, with Halkbank's assistance, multiple massive terrorist finance schemes that were plainly criminal. He subsequently pleaded guilty to criminal violations arising from this conduct.

175.    Halkbank also acted with a culpable state of mind. Halkbank executive Balkan told an IRGC-QF general that he was an "inside man" willing to help the IRGC move money. Halkbank executive Atilla has been convicted of the conduct described herein. And other Halkbank executives willfully participated and are now fugitives for their roles in this massive terrorist finance scheme.

176.    Zarrab and Halkbank also knowingly engaged in a prolonged campaign of deception that included lying to regulators, falsifying documents, and even fabricating fake humanitarian food shipments to conceal their ongoing support for the IRGC. They did so with full knowledge that they were laundering oil revenue for an IRGC front in violation of anti-terrorism sanctions. And they did so even after receiving specific warnings from the U.S. Treasury Department and being arrested by Turkish authorities. Defendants' state of mind was accordingly highly culpable.

177.    As alleged *supra*, Defendants knew that the beneficiaries of their illegal conduct would be the IRGC and its terrorist proxies. The IRGC's ongoing role in anti-American terrorist violence was sufficiently well established that Defendants knew that by helping the IRGC access such massive amounts of capital, they were helping terrorists attack Americans.

178.    **Duration of Assistance.** Defendants' assistance lasted approximately four years, from early 2012 until March 2016. But Defendants did not end the scheme voluntarily; instead, they only stopped because Zarrab and then Atilla were arrested by U.S. authorities. Left to their

own devices, Defendants would have continued providing support to terrorists in perpetuity. This shows that Defendants acted culpably and intentionally.

179.    The amount of money Defendants laundered for the IRGC was sufficient to fund terrorist attacks for many years after the last transaction took place. Attacks like the ones at issue here cost thousands of dollars—not millions—to perpetrate. By helping the IRGC move *billions* of dollars, Defendants facilitated terrorism for many years after the authorities stopped their scheme.

180.    Collectively, these factors show that Defendants' assistance was substantial vis-à-vis both the terrorist attacks that injured Plaintiffs and the global IRGC terrorist conspiracy. Defendants' culpable, pervasive, and systemic assistance renders them liable for every attack at issue in this case.

## IV.    PLAINTIFFS' CLAIMS ARE TIMELY

181.    The ATA provides that suits for damages must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335. This statute of limitations applies to all ATA claims, including claims for aiding and abetting under JASTA. JASTA, however, was not enacted until September 28, 2016. Accordingly, Plaintiffs' claims could not have accrued before that date, and Plaintiffs' claims are all timely because they are being brought within 10 years after September 28, 2016, the date they accrued.

182.    If the Court concludes that Plaintiffs' causes of action accrued earlier (*e.g.*, on the date of the terrorist attacks that injured them), and to the extent tolling is required for any particular Plaintiff's claim, Plaintiffs are entitled to tolling because Defendants fraudulently concealed their misconduct, and no plaintiff exercising reasonable diligence could have discovered that misconduct prior to March 31, 2016, when Reza Zarrab and his co-conspirators were indicted in the United States.

183.    Defendants' misconduct, which involved fraud, money laundering, and deceiving the U.S. Treasury Department and U.S. financial institutions, was inherently self-concealing. Indeed, the entire point of the misconduct was to move money inside of Halkbank in ways that were undetectable, before smuggling it out in the form of untraceable gold bars. None of the transactions were visible to third parties, let alone to individuals in Plaintiffs' position.

184.    Defendants went to extreme lengths to conceal their wrongdoing. In addition to using a web of front companies to conceal the origin of the NIOC revenue (including Royal Group and its affiliates, *supra* ¶ 84), Defendants and their agents falsified documents describing the purpose and beneficiaries of gold transactions and the existence of humanitarian food trades (*supra* ¶¶ 87-88, 94, 99), lied to high-ranking officials in the U.S. Treasury Department about their compliance (*supra* ¶¶ 92, 100), paid bribes to Turkish authorities to look the other way (*supra* ¶ 86), paid bribes to escape Turkish criminal proceedings against them and to suppress the evidence of their wrongdoing (*supra* ¶ 96), and issued high-profile false denials of wrongdoing to avoid public scrutiny (*supra* ¶ 97).

185.    Ultimately, Defendants' misconduct was only discovered because—as revealed at Atilla's criminal trial—a Turkish police officer, Huseyin Korkmaz, acting on his own initiative and at tremendous risk to himself, retrieved incriminating evidence about the scheme from the Turkish prosecutor's office after Zarrab's bribes had sabotaged the case, smuggled the evidence out of the country against the wishes of the Turkish political establishment, and delivered it to authorities in the United States, which combined that evidence with the fruits of the U.S. government's own confidential investigation to produce the indictment of Reza Zarrab in March 2016.

186.     Accordingly, to the extent the statute of limitations began running before March 31, 2016, it must be tolled prior to that date because no plaintiff exercising diligence could have uncovered Defendants' support for terrorists prior to that date.

## V.     THE IRGC'S TERRORIST PROXIES COMMITTED, PLANNED, AND AUTHORIZED THE ATTACKS THAT KILLED AND INJURED PLAINTIFFS IN AFGHANISTAN

187.     Plaintiffs are American civilians, servicemembers, and contractors serving in Afghanistan, and their family members, who were killed or injured in terrorist attacks committed by al-Qaeda (a designated FTO at the time) and the Taliban, including its Haqqani Network (a designated FTO as of September 19, 2022), collaborating in a terrorist syndicate that was funded, armed, and logistically supported by the IRGC, including the IRGC-QF.

188.     For those Plaintiffs with family members who were injured or died as a result, each Plaintiff has experienced severe mental anguish, emotional pain and suffering, and the loss of their family member's society, companionship, and counsel.

189.     The IRGC used its resources to provide al-Qaeda and the Taliban (including its Haqqani Network) weapons, funds, training, logistical support, communications technology, safe haven, and assistance with narcotics trafficking, which raised money for their shared terrorist enterprise against America. Al-Qaeda and the Taliban, including its Haqqani Network, used these resources to commit the attacks that injured Plaintiffs.

190.     For attacks that occurred in Afghanistan, each suicide attack alleged below was committed by al-Qaeda (an FTO) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the bomber, who was deployed by the Taliban. The suicide bomber who detonated the bomb during each suicide attack alleged below was: (i) indoctrinated by al-Qaeda regarding the purported religious justification for the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide

bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, which required the bomber to pledge loyalty to al-Qaeda.

191.   For attacks that occurred in Afghanistan, each device that the suicide bomber detonated, and each bomb detonated during an IED attack, during each attack alleged below was: (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

192.   Each attack alleged below would have violated the laws of war if these terrorists were subject to them because, *inter alia*, the terrorists who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and each IED's passive detonation system and each suicide bomb attack indiscriminately placed civilians at risk.

### A.   February 10, 2014 Suicide Attack in Kabul (Michael Hughes and Paul Goins Jr. Families)

193.   On February 10, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban, acting together as the Kabul Attack Network, committed a suicide attack in Kabul Province, Afghanistan (the "February 10, 2014 Attack"), which was facilitated by the IRGC's provision of funding, personnel, weapons and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the February 10, 2014 Attack.

194.   The February 10, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

195.     **Mr. Michael Hughes** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Hughes was injured in the February 10, 2014 Attack. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the February 10, 2014 Attack.

196.     Mr. Hughes was a U.S. national at the time of the attack and his death.

197.     Plaintiff Daniel Hughes is the brother of Mr. Hughes and a U.S. national.

198.     Plaintiff Kristine Zitny is the sister of Mr. Hughes and a U.S. national.

199.     Plaintiff Kathleen Alexander is the sister of Mr. Hughes and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Hughes's estate.

200.     Plaintiff Patricia Hughes is the sister of Mr. Hughes and a U.S. national.

201.     As a result of the February 10, 2014 Attack and Mr. Hughes's injuries and death, each member of the Hughes Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Hughes's society, companionship, and counsel.

202.     As a result of the February 10, 2014 Attack, Mr. Hughes was injured in his person and/or property. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

203.     **Paul E. Goins Jr.** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Goins was injured in the February 10, 2014 Attack. Mr. Goins died on February 10, 2014 as a result of injuries sustained during the February 10, 2014 Attack.

204.     Mr. Goins was a U.S. national at the time of the attack and his death.

205.     Plaintiff Patricia Goins is the widow of Mr. Goins and a U.S. national.

206.     Plaintiff Paul Goins III is the son of Mr. Goins and a U.S. national.

207.     Plaintiff Janice Caruso is the stepdaughter of Mr. Goins and a U.S. national. Ms. Caruso lived in the same household as Mr. Goins for a substantial period and considered Mr. Goins the functional equivalent of a biological father.

208.     Plaintiff Dana Rainey is the stepdaughter of Mr. Goins and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Goins's estate. Ms. Rainey lived in the same household as Mr. Goins for a substantial period and considered Mr. Goins the functional equivalent of a biological father.

209.     Plaintiff Emmitt Burns is the stepson of Mr. Goins and a U.S. national. Mr. Burns lived in the same household as Mr. Goins for a substantial period and considered Mr. Goins the functional equivalent of a biological father.

210.     As a result of the February 10, 2014 Attack and Mr. Goins's injuries and death, each member of the Goins Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Goins's society, companionship, and counsel.

211.     As a result of the February 10, 2014 Attack, Mr. Goins was injured in his person and/or property. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

### B. February 22, 2013 IED Attack in Helmand (Jonathan Davis Family)

212.     On February 22, 2013, the Taliban committed an IED attack in Helmand Province, Afghanistan (the "February 22, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the February 22, 2013 Attack.

213.     The February 22, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

71

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

214.  **Staff Sergeant Jonathan Davis** served in Afghanistan as a member of the U.S. Marine Corps. SSgt Davis was injured in the February 22, 2013 Attack. SSgt Davis died on February 22, 2013 as a result of injuries sustained during the February 22, 2013 Attack.

215.  SSgt Davis was a U.S. national at the time of the attack and his death.

216.  Plaintiff Helena Davis is the widow of SSgt Davis and a U.S. national.

217.  Plaintiff C.D., by and through his next friend Helena Davis, is the minor son of SSgt Davis. He is a U.S. national.

218.  As a result of the February 22, 2013 attack and SSgt Davis's injuries and death, each member of the Davis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt Davis's society, companionship, and counsel.

219.  As a result of the February 22, 2013 Attack, SSgt Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

**C. April 6, 2013 Suicide Attack in Zabul (Anne Smedinghoff Family)**

220.  On April 6, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Zabul Province, Afghanistan (the "April 6, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the April 6, 2013 Attack.

221.  The April 6, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

222.     **Anne Smedinghoff** served in Afghanistan as a U.S. Foreign Service Officer working for the U.S. Department of State. Ms. Smedinghoff was injured in the April 6, 2013 Attack. Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the April 6, 2013 Attack. She was just 25 years old when she died.

223.     Ms. Smedinghoff did not die immediately following the April 6, 2013 Attack. Though grievously injured, she was awake and alert while being air-transported to a nearby medical clinic. Upon her arrival, Ms. Smedinghoff's blood pressure dropped significantly due to severe internal bleeding, and she required significant blood transfusions. Her condition continued to deteriorate, and she eventually succumbed to her severe injuries roughly two hours after the attack.

224.     Ms. Smedinghoff was a U.S. national at the time of the attack and her death.

225.     Plaintiff Mary Smedinghoff is the mother of Ms. Smedinghoff and a U.S. national.

226.     Plaintiff Thomas Smedinghoff is the father of Ms. Smedinghoff and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of Ms. Smedinghoff's estate.

227.     Plaintiff Regina Smedinghoff is the sister of Ms. Smedinghoff and a U.S. national.

228.     Plaintiff Joan Smedinghoff is the sister of Ms. Smedinghoff and a U.S. national.

229.     Plaintiff Mark Smedinghoff is the brother of Ms. Smedinghoff and a U.S. national.

230.     As a result of the April 6, 2013 Attack and Ms. Smedinghoff's injuries and death, each member of the Smedinghoff Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Smedinghoff's society, companionship, and counsel.

231.     As a result of the April 6, 2013 Attack, Ms. Smedinghoff was injured in her person and/or property. The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

### D. May 4, 2013 IED Attack in Kandahar (Brandon Landrum, Brandon Prescott, Francis Phillips IV, Kevin Cardoza, and Thomas Murach Families)

232.     On May 4, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 4, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the May 4, 2013 Attack.

233.     The May 4, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

234.     **First Lieutenant Brandon Landrum** served in Afghanistan as a member of the U.S. Army. 1LT Landrum was injured in the May 4, 2013 Attack. 1LT Landrum died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack. He was just 26 years old when he died.

235.     1LT Landrum was a U.S. national at the time of the attack and his death.

236.    Plaintiff Miranda Landrum is the widow of 1LT Landrum and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of 1LT Landrum's estate.

237.    Plaintiff G.L., by and through his next friend Miranda Landrum, is the minor son of 1LT Landrum. He is a U.S. national.

238.    Plaintiff B.L., by and through her next friend Miranda Landrum, is the minor daughter of 1LT Landrum. She is a U.S. national.

239.    Plaintiff Janet Landrum is the mother of 1LT Landrum and a U.S. national.

240.    Plaintiff James Landrum is the father of 1LT Landrum and a U.S. national.

241.    As a result of the May 4, 2013 Attack and 1LT Landrum's injuries and death, each member of the Landrum Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Landrum's society, companionship, and counsel.

242.    As a result of the May 4, 2013 Attack, 1LT Landrum was injured in his person and/or property. The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages 1LT Landrum sustained.

243.    **Specialist Brandon Prescott** served in Afghanistan as a member of the U.S. Army. SPC Prescott was injured in the May 4, 2013 Attack. SPC Prescott died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack. He was just 24 years old when he died.

244.    SPC Prescott was a U.S. national at the time of the attack and his death.

245.    Plaintiff Tracey Prescott is the mother of SPC Prescott and a Canadian citizen residing in California.

246.    Plaintiff Joseph Prescott is the father of SPC Prescott and a U.S. national.

247.    Plaintiff Jacob Prescott is the brother of SPC Prescott and a U.S. national.

248.    Plaintiff Aaron Prescott is the brother of SPC Prescott and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Prescott's estate.

249.    Plaintiff Joshua Prescott is the brother of SPC Prescott and a U.S. national.

250.    As a result of the May 4, 2013 Attack and SPC Prescott's injuries and death, each member of the Prescott Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Prescott's society, companionship, and counsel.

251.    As a result of the May 4, 2013 Attack, SPC Prescott was injured in his person and/or property. The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

252.    **Staff Sergeant Francis Phillips IV** served in Afghanistan as a member of the U.S. Army. SSG Phillips was injured in the May 4, 2013 Attack. SSG Phillips died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack. He was just 28 years old when he died.

253.    SSG Phillips was a U.S. national at the time of the attack and his death.

254.    Plaintiff Christine Phillips is the widow of SSG Phillips and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of SSG Phillips's estate.

255.    Plaintiff S.P., by and through her next friend Christine Phillips, is the minor daughter of SSG Phillips. She is a U.S. national.

256.    As a result of the May 4, 2013 Attack and SSG Phillips's injuries and death, each member of the Phillips Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Phillips's society, companionship, and counsel.

257.     As a result of the May 4, 2013 Attack, SSG Phillips was injured in his person and/or property. The Plaintiff members of the Phillips Family are the survivors and/or heirs of SSG Phillips and are entitled to recover for the damages SSG Phillips sustained.

258.     **Specialist Kevin Cardoza** served in Afghanistan as a member of the U.S. Army. SPC Cardoza was injured in the May 4, 2013 Attack. SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack. He was just 19 years old when he died.

259.     SPC Cardoza was a U.S. national at the time of the attack and his death.

260.     Plaintiff Maria Cardoza is the mother of SPC Cardoza and a U.S. national.

261.     Plaintiff Ramiro Cardoza Sr. is the father of SPC Cardoza and a U.S. national.

262.     Plaintiff Ramiro Cardoza Jr. is the brother of SPC Cardoza and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Cardoza's estate.

263.     As a result of the May 4, 2013 Attack and SPC Cardoza's injuries and death, each member of the Cardoza Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Cardoza's society, companionship, and counsel.

264.     As a result of the May 4, 2013 Attack, SPC Cardoza was injured in his person and/or property. The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and are entitled to recover for the damages SPC Cardoza sustained.

265.     **Specialist Thomas Murach** served in Afghanistan as a member of the U.S. Army. SPC Murach was injured in the May 4, 2013 Attack. SPC Murach died on May 4, 2013 as a result of injuries sustained during the May 4, 2013 Attack. He was just 22 years old when he died.

266.     SPC Murach was a U.S. national at the time of the attack and his death.

267.    Plaintiff Chet Murach is the father of SPC Murach and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Murach's estate.

268.    Plaintiff William Murach is the brother of SPC Murach and a U.S. national.

269.    As a result of the May 4, 2013 Attack and SPC Murach's injuries and death, each member of the Murach Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Murach's society, companionship, and counsel.

270.    As a result of the May 4, 2013 Attack, SPC Murach was injured in his person and/or property. The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

### E.    May 14, 2013 IED Attack in Kandahar (Mitchell Daehling, William Gilbert Families)

271.    On May 14, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "May 14, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the May 14, 2013 Attack.

272.    The May 14, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

273.    **Specialist Mitchell Daehling** served in Afghanistan as a member of the U.S. Army. SPC Daehling was injured in the May 14, 2013 Attack. SPC Daehling died on May 14, 2013 as a result of injuries sustained during the May 14, 2013 Attack. He was just 24 years old when he died.

274.    SPC Daehling did not die immediately following the initial May 14, 2013 IED explosion. The first IED detonated and severely wounded SPC Daehling, including severing both of his legs—one at the knee and the other mid-shin. While attempting to MEDEVAC SPC Daehling and the other wounded servicemembers, the detonation of a second IED killed SPC Daehling.

275.    SPC Daehling was a U.S. national at the time of the attack and his death.

276.    Plaintiff Samantha McNamara is the widow of SPC Daehling and a U.S. national.

277.    Plaintiff Brenda Daehling is the mother of SPC Daehling and a U.S. national.

278.    Plaintiff Kirk Daehling is the father of SPC Daehling and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Daehling's estate.

279.    Plaintiff Adam Daehling is the brother of SPC Daehling and a U.S. national.

280.    Plaintiff Kayla Daehling is the sister of SPC Daehling and a U.S. national.

281.    As a result of the May 14, 2013 Attack and SPC Daehling's injuries and death, each member of the Daehling Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Daehling's society, companionship, and counsel.

282.    As a result of the May 14, 2013 Attack, SPC Daehling was injured in his person and/or property. The Plaintiff members of the Daehling Family are the survivors and/or heirs of SPC Daehling and are entitled to recover for the damages SPC Daehling sustained.

283.    **Specialist William Gilbert** served in Afghanistan as a member of the U.S. Army. SPC Gilbert was injured in the May 14, 2013 Attack. SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the May 14, 2013 Attack. He was just 24 years old when he died.

284.    SPC Gilbert was a U.S. national at the time of the attack and his death.

285.     Plaintiff Joanna Gilbert is the mother of SPC Gilbert and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of SPC Gilbert's estate.

286.     Plaintiff Jessica Benson is the sister of SPC Gilbert and a U.S. national.

287.     As a result of the May 14, 2013 Attack and SPC Gilbert's injuries and death, each member of the Gilbert Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Gilbert's society, companionship, and counsel.

288.     As a result of the May 14, 2013 Attack, SPC Gilbert was injured in his person and/or property. The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

### F.     May 16, 2013 Suicide Attack in Kabul (Angel Roldan Jr. Family)

289.     On May 16, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban, acting together as the Kabul Attack Network, committed a suicide bombing attack in Kabul, Afghanistan (the "May 16, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the May 16, 2013 Attack.

290.     The May 16, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

291.     **Angel Roldan Jr.** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. Roldan was injured in the May 16, 2013 Attack. Mr. Roldan died on May 16, 2013 at the age of 62 as a result of injuries sustained during the May 16, 2013 Attack.

292.     Mr. Roldan was a U.S. national at the time of the attack and his death.

80

293.     Plaintiff Lieselotte Roldan is the widow of Mr. Roldan and a U.S. national.

294.     Plaintiff Matthias Roldan is the son of Mr. Roldan and a U.S. national.

295.     Plaintiff Angel R. Roldan is the son of Mr. Roldan and a U.S. national.

296.     Plaintiff Samantha Roldan is the daughter of Mr. Roldan and a U.S. national.

297.     Plaintiff Chapman Good brings a claim in his representative capacity only on behalf of Mr. Roldan's estate.

298.     As a result of the May 16, 2013 Attack and Mr. Roldan's injuries and death, each member of the Roldan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Roldan's society, companionship, and counsel.

299.     As a result of the May 16, 2013 Attack, Mr. Roldan was injured in his person and/or property. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

### G.  June 2, 2013 IED Attack in Nimruz (Sean Mullen Family)

300.     On June 2, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Nimruz Province, Afghanistan (the "June 2, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the June 2, 2013 Attack.

301.     The June 2, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

302.     **Warrant Officer Sean Mullen** served in Afghanistan as a member of the U.S. Army. WO1 Mullen was injured in the June 2, 2013 Attack. WO1 Mullen died on June 2, 2013 as

a result of injuries sustained during the June 2, 2013 Attack. He was just 39 years old when he died.

303.     WO1 Mullen was a U.S. national at the time of the attack and his death.

304.     Plaintiff Nancy Mullen is the widow of WO1 Mullen and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of WO1 Mullen's estate.

305.     Plaintiff Miriam Mullen is the mother of WO1 Mullen and a U.S. national.

306.     Plaintiff William Mullen is the father of WO1 Mullen and a U.S. national.

307.     As a result of the June 2, 2013 Attack and WO1 Mullen's injuries and death, each member of the Mullen Family has experienced severe mental anguish, emotional pain and suffering, and the loss of WO1 Mullen's society, companionship, and counsel.

308.     As a result of the June 2, 2013 Attack, WO1 Mullen was injured in his person and/or property. The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.

**H.   June 18, 2013 Rocket Attack in Parwan (Robert Ellis Family)**

309.     On June 18, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a rocket attack in Parwan, Afghanistan (the "June 18, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the June 18, 2013 Attack.

310.     The June 18, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

311.   **Specialist Robert Ellis** served in Afghanistan as a member of the U.S. Army. SPC Ellis was injured in the June 18, 2013 Attack. SPC Ellis died on June 18, 2013 as a result of injuries sustained during the June 18, 2013 Attack.

312.   SPC Ellis was a U.S. national at the time of the attack and his death.

313.   Plaintiff Joelle Ellis is the mother of SPC Ellis and a U.S. national.

314.   Plaintiff John Ellis is the father of SPC Ellis and a U.S. national.

315.   Plaintiff James Ellis is the brother of SPC Ellis and a U.S. national.

316.   As a result of the June 18, 2013 Attack and SPC Ellis's injuries and death, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Ellis's society, companionship, and counsel.

317.   As a result of the June 18, 2013 Attack, SPC Ellis was injured in his person and/or property. The Plaintiff members of the Ellis Family are the survivors and/or heirs of SPC Ellis and are entitled to recover for the damages SPC Ellis sustained.

**I.   June 23, 2013 IED Attack in Paktika (Brandon Korona)**

318.   On June 23, 2013, a joint cell comprised of an FTO, al-Qaeda, and an FTO, the Haqqani Network, a part of the Taliban, committed an IED attack in Paktika Province, Afghanistan (the "June 23, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the June 23, 2013 Attack.

319.   The June 23, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

320.   **Sergeant Brandon Korona** served in Afghanistan as a member of the U.S. Army. SGT Korona was injured in the June 23, 2013 Attack. The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below knee amputation in 2017, a fractured right ankle, and a traumatic brain injury. As a result of the June 23, 2013 Attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

321.   Plaintiff SGT Korona was a U.S. national at the time of the attack and remains one today.

322.   As a result of the June 23, 2013 Attack and SGT Korona's injuries, SGT Korona has experienced severe mental anguish, emotional pain and suffering.

**J.   July 15, 2013 Recoilless Rifle Attack in Paktia (Sonny Zimmerman Family)**

323.   On July 15, 2013, a joint cell comprised of an FTO, al-Qaeda, and an FTO, the Haqqani Network, a part of the Taliban, committed an attack involving a recoilless rifle in Paktia, Afghanistan (the "July 15, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the July 15, 2013 Attack.

324.   The July 15, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

325.   **Staff Sergeant Sonny Zimmerman** served in Afghanistan as a member of the U.S. Army. SSG Zimmerman was injured in the July 15, 2013 Attack. SSG Zimmerman died on July 16, 2013 as a result of injuries sustained during the July 15, 2013 Attack.

326.   SSG Zimmerman was a U.S. national at the time of the attack and his death.

327.   Plaintiff Michelle Zimmerman is the mother of SSG Zimmerman and a U.S. national.

328.     Plaintiff Chris Zimmerman is the father of SSG Zimmerman and a U.S. national.

329.     Plaintiff Baily Zimmerman is the sister of SSG Zimmerman and a U.S. national.

330.     As a result of the July 15, 2013 Attack and SSG Zimmerman's injuries and death, each member of the Zimmerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Zimmerman's society, companionship, and counsel.

331.     As a result of the July 15, 2013 Attack, SSG Zimmerman was injured in his person and/or property. The Plaintiff members of the Zimmerman Family are the survivors and/or heirs of SSG Zimmerman and are entitled to recover for the damages SSG Zimmerman sustained.

### K.  July 23, 2013 IED Attack in Wardak (Nickolas S. Welch and Rob L. Nichols Families)

332.     On July 23, 2013, a joint cell comprised of an FTO, al-Qaeda, and an FTO, the Haqqani Network, a part of the Taliban, committed an IED attack in Wardak Province, Afghanistan (the "July 23, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the July 23, 2013 Attack.

333.     The July 23, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

334.     **Specialist Nickolas Welch** served in Afghanistan as a member of the U.S. Army. SPC Welch was injured in the July 23, 2013 Attack. SPC Welch died on August 6, 2013 as a result of injuries sustained during the July 23, 2013 Attack. He was just 26 years old when he died.

335.     Though SPC Welch was awake in the immediate aftermath of the July 23, 2013 Attack, he sustained severe injuries from the detonation, including multiple contusions from ball bearings that were added to the IED to ensure maximum damage. SPC Welch also suffered a traumatic brain injury in the attack, which required the surgical placement of two shunts in his brain. Notwithstanding the medical care he received, SPC Welch succumbed to his injuries approximately two weeks after the attack, on August 6, 2013.

336.     SPC Welch was a U.S. national at the time of the attack and his death.

337.     Plaintiff Lorria Welch is the mother of SPC Welch and a U.S national.

338.     Plaintiff Barry Welch is the father of SPC Welch and a U.S national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Welch's estate.

339.     Plaintiff Zackary Welch is the brother of SPC Welch and a U.S national.

340.     As a result of the July 23, 2013 Attack and SPC Welch's injuries and death, each member of the Welch Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Welch's society, companionship, and counsel.

341.     As a result of the July 23, 2013 Attack, SPC Welch was injured in his person and/or property. The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

342.     **Specialist Rob Nichols** served in Afghanistan as a member of the U.S. Army. SPC Nichols was injured in the July 23, 2013 Attack. SPC Nichols died on July 23, 2013 as a result of injuries sustained during the July 23, 2013 Attack. He was just 24 years old when he died.

343.     SPC Nichols was a U.S. national at the time of the attack and his death.

344.    Plaintiff Bruce Nichols is the father of SPC Nichols and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Nichols's estate.

345.    Plaintiff Jeanne Nichols is the stepmother of SPC Nichols and a U.S. national. Ms. Nichols lived in the same household as SPC Nichols for a substantial period and considered SPC Nichols the functional equivalent of a biological son.

346.    Plaintiff Molly Nichols is the sister of SPC Nichols. She is a U.S. national.

347.    As a result of the July 23, 2013 Attack and SPC Nichols's injuries and death, each member of the Nichols Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nichols's society, companionship, and counsel.

348.    As a result of the July 23, 2013 Attack, SPC Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

**L.  July 30, 2013 Indirect Fire Attack in Logar (Nicholas Burley Family)**

349.    On July 30, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an indirect fire attack in Logar, Afghanistan (the "July 30, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the July 30, 2013 Attack.

350.    The July 30, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

351.    **Specialist Nicholas Burley** served in Afghanistan as a member of the U.S. Army. SPC Burley was injured in the July 30, 2013 Attack. SPC Burley died on July 30, 2013 as a result of injuries sustained during the July 30, 2013 Attack.

352.   SPC Burley was a U.S. national at the time of the attack and his death.

353.   Plaintiff Tammy Olmstead is the mother of SPC Burley and a U.S. national.

354.   Plaintiff William M. Burley is the father of SPC Burley and a U.S. national.

355.   Plaintiff Dan Olmstead is the stepfather of SPC Burley and a U.S. national. Mr. Olmstead lived in the same household as SPC Burley for a substantial period and considered SPC Burley the functional equivalent of a biological son.

356.   Plaintiff Michael Collins is the brother of SPC Burley and a U.S. national.

357.   As a result of the July 30, 2013 Attack and SPC Burley's injuries and death, each member of the Burley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Burley's society, companionship, and counsel.

358.   As a result of the July 30, 2013 Attack, SPC Burley was injured in his person and/or property. The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

**M. August 12, 2013 IED Attack in Logar (James Wickliff Chacin Family)**

359.   On August 12, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Logar Province, Afghanistan (the "August 12, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the August 12, 2013 Attack.

360.   The August 12, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

361.   **Specialist James Wickliff Chacin** served in Afghanistan as a member of the U.S. Army. SPC Wickliff Chacin was injured in the August 12, 2013 Attack. SPC Wickliff Chacin died

on September 20, 2013 as a result of injuries sustained during the August 12, 2013 Attack. He was just 22 years old when he died.

362.     SPC Wickliff Chacin sustained severe injuries in the August 12, 2013 Attack, including fractures in his right tibia and fibula, his left femur, and his pelvis, second degree burns, and significant soft tissue damage to both legs. In addition, the IED blast propelled SPC Wickliff Chacin's body into a nearby canal that was contaminated with fungus, which caused him to develop a rare fungal infection that complicated his medical treatment and eventually caused his death. Notwithstanding the severe injuries he sustained, SPC Wickliff Chacin was awake and alert in the immediate aftermath of the attack while being air-transported to a nearby hospital at Bagram Airfield. After having most of the lower half of his body amputated in an effort to try to stop the spread of the life-threatening fungal infection he sustained during the August 12, 2013 Attack, SPC Wickliff Chacin eventually succumbed to his injuries 39 days later, on September 20, 2013

363.     SPC Wickliff Chacin was a U.S. national at the time of the attack and his death.

364.     Plaintiff Martha Smith is the mother of SPC Wickliff Chacin and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of SPC Wickliff Chacin's estate.

365.     Plaintiff Thomas Wickliff is the father of SPC Wickliff Chacin and a U.S. national.

366.     Plaintiff Michelle Rotelli is the sister of SPC Wickliff Chacin and a U.S. national.

367.     As a result of the August 12, 2013 Attack and SPC Wickliff Chacin's injuries and death, each Wickliff Chacin Family member has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Wickliff Chacin's society, companionship, and counsel.

368.     As a result of the August 12, 2013 Attack, SPC Wickliff Chacin was injured in his person and/or property. The Plaintiff members of the Wickliff Chacin Family are the survivors and/or heirs of SPC Wickliff Chacin and are entitled to recover for the damages SPC Wickliff Chacin sustained.

### N.  August 20, 2013 Small Arms Attack in Wardak (George Bannar Jr. Family)

369.     On August 20, 2013, a joint cell comprised of al-Qaeda, an FTO, and the Haqqani Network, a part of the Taliban and an FTO, committed a small arms attack in Wardak Province, Afghanistan (the "August 20, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the August 20, 2013 Attack.

370.     The August 20, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

371.     **Master Sergeant George Bannar Jr.** served in Afghanistan as a member of the U.S. Army. MSG Bannar was injured in the August 20, 2013 Attack. MSG Bannar died on August 20, 2013 as a result of injuries sustained during the August 20, 2013 Attack.

372.     MSG Bannar was a U.S. national at the time of the attack and his death.

373.     Plaintiff Sheila Long is the mother of MSG Bannar and a U.S. national.

374.     As a result of the August 20, 2013 Attack and MSG Bannar's injuries and death, each member of the Bannar Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Bannar's society, companionship, and counsel.

375.     As a result of the August 20, 2013 Attack, MSG Bannar was injured in his person and/or property. The Plaintiff members of the Bannar Family are the survivors and/or heirs of MSG Bannar and are entitled to recover for the damages MSG Bannar sustained.

### O. October 5, 2013 IED Attack in Kandahar (Cody Patterson and Joseph Peters Families)

376.    On October 5, 2013, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "October 5, 2013 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the October 5, 2013 Attack.

377.    The October 5, 2013 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

378.    **Specialist Cody Patterson** served in Afghanistan as a member of the U.S. Army. SPC Patterson was injured in the October 5, 2013 Attack. SPC Patterson died on October 5, 2013 as a result of injuries sustained during the October 5, 2013 Attack. He was just 24 years old when he died.

379.    SPC Patterson was a U.S. national at the time of the attack and his death.

380.    Plaintiff Nancy Wilson is the mother of SPC Patterson and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of SPC Patterson's estate.

381.    Plaintiff Kapriel Wilson brother of SPC Patterson and a U.S. national.

382.    Plaintiff Mara Wilson sister of SPC Patterson and a U.S. national.

383.    As a result of the October 5, 2013 Attack and SPC Patterson's injuries and death, each member of the Patterson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Patterson's society, companionship, and counsel.

384.   As a result of the October 5, 2013 Attack, SPC Patterson was injured in his person and/or property. The Plaintiff members of the Patterson Family are the survivors and/or heirs of SPC Patterson and are entitled to recover for the damages SPC Patterson sustained.

385.   **Sergeant Joseph Peters** served in Afghanistan as a member of the U.S. Army. SGT Peters was injured in the October 5, 2013 Attack. SGT Peters died on October 5, 2013 as a result of injuries sustained during the October 5, 2013 Attack. He was just 24 years old when he died.

386.   SGT Peters was a U.S. national at the time of the attack and his death.

387.   Plaintiff Ashley Gerding is the widow of SGT Peters and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of SGT Peters's estate.

388.   Plaintiff G.P., by and through his next friend Ashley Peters, is the minor son of SGT Peters. He is a U.S. national.

389.   Plaintiff Deborah Peters is the mother of SGT Peters and a U.S. national.

390.   Plaintiff Dennis Peters is the father of SGT Peters and a U.S. national.

391.   As a result of the October 5, 2013 Attack and SGT Peters's injuries and death, each member of the Peters Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Peters's society, companionship, and counsel.

392.   As a result of the October 5, 2013 Attack, SGT Peters was injured in his person and/or property. The Plaintiff members of the Peters Family are the survivors and/or heirs of SGT Peters and are entitled to recover for the damages SGT Peters sustained.

### P.  January 20, 2014 Small Arms Attack in Kandahar (Edward Balli)

393.   On January 20, 2014, a joint cell comprised of al-Qaeda, an FTO, and the Taliban committed a small arms attack in Kandahar Province, Afghanistan (the "January 20, 2014

Attack"), which was facilitated by the IRGC' provision of funding, personnel, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the January 20, 2014 Attack.

394. The January 20, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

395. **Chief Warrant Officer 2 Edward Balli** served in Afghanistan as a member of the U.S. Army. CW2 Balli was injured in the January 20, 2014 Attack. CW2 Balli died on January 20, 2014 as a result of injuries sustained during the January 20, 2014 Attack.

396. CW2 Balli was a U.S. national at the time of the attack and his death.

397. Plaintiff Michael Donios is the son of CW2 Balli and a U.S. national.

398. As a result of the January 20, 2014 Attack and CW2 Balli's injuries and death, each member of the Balli Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CW2 Balli's society, companionship, and counsel.

399. As a result of the January 20, 2014 Attack, CW2 Balli was injured in his person and/or property. The Plaintiff members of the Balli Family are the survivors and/or heirs of CW2 Balli and are entitled to recover for the damages CW2 Balli sustained.

## Q. February 15, 2014 Complex Attack In Helmand Province (Aaron Torian Family)

400. On February 15, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving an IED and small arms fire in Helmand Province, Afghanistan (the "February 15, 2014 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the February 15, 2014 Attack.

401.   The February 15, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the IED's passive detonation system indiscriminately placed civilians at risk.

402.   **Master Sergeant Aaron Torian** served in Afghanistan as a member of the U.S. Marine Corps. MSgt Torian was injured in the February 15, 2014 Attack. MSgt Torian died on February 15, 2014 as a result of his injuries from the February 15, 2014 Attack.

403.   MSgt Torian was a U.S. national at the time of the attack and his death.

404.   Plaintiff Esta Smith is the mother of MSgt Torian and a U.S. national.

405.   Plaintiff Joe Torian is the father of MSgt Torian and a U.S. national.

406.   Plaintiff Nathan Torian is the brother of MSgt Torian and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of MSgt Torian's estate.

407.   Plaintiff Emily Torian is the sister of MSgt Torian and a U.S. national.

408.   Plaintiff Jimmy Smith is the stepfather of MSgt Torian and a U.S. national. Mr. Smith lived in the same household as MSgt Torian for a substantial period and considered MSgt Torian the functional equivalent of a biological son.

409.   As a result of the February 15, 2014 Attack and MSgt Torian's injuries and death, each member of the Torian Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSgt Torian's society, companionship, and counsel.

410.   As a result of the February 15, 2014 Attack, MSgt Torian was injured in his person and/or property. The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

### R.  June 2, 2014 Small Arms Fire Attack in Nangarhar (Jason Jones Family)

411.    On June 2, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a small arms fire attack in Nangarhar, Afghanistan (the "June 2, 2014 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the June 2, 2014 Attack.

412.    The June 2, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

413.    **Captain Jason Jones** served in Afghanistan as a member of the U.S. Army. CPT Jones was injured in the June 2, 2014 Attack. CPT Jones died on June 2, 2014 as a result of injuries sustained during the June 2, 2014 Attack.

414.    CPT Jones was a U.S. national at the time of the attack and his death.

415.    Plaintiff Joseph Jones Jr. is the father of CPT Jones and a U.S. national.

416.    As a result of the June 2, 2014 Attack and CPT Jones's injuries and death, each member of the Jones Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Jones's society, companionship, and counsel.

417.    As a result of the June 2, 2014 Attack, CPT Jones was injured in his person and/or property. The Plaintiff members of the Jones Family are the survivors and/or heirs of CPT Jones and are entitled to recover for the damages CPT Jones sustained.

### S.  August 12, 2014 IED Attack in Kandahar (Alberto Diaz Family)

418.    On August 12, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an IED attack in Kandahar Province, Afghanistan (the "August 12, 2014 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the August 12, 2014 Attack.

419.    The August 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

420.    **Specialist Alberto Diaz** served in Afghanistan as a member of the U.S. Army. SPC Diaz was injured in the August 12, 2014 Attack. The attack severely wounded SPC Diaz, who suffered severe brain injuries and facial damage requiring complete right side facial reconstruction, and also suffers from PTSD, chronic fatigue syndrome, chronic pain, social anxiety, panic attacks, hearing loss, and tremors. As a result of the August 12, 2014 Attack and his injuries, SPC Diaz has experienced severe physical and emotional pain and suffering.

421.    Plaintiff SPC Diaz was a U.S. national at the time of the attack, and remains one today.

422.    Plaintiff Kayla Diaz is the wife of SPC Diaz and a U.S. national.

423.    Plaintiff N.J.A.D., by and through his next friend Kayla Diaz, is the minor son of SPC Diaz. He is a U.S. national.

424.    Plaintiff N.J.D., by and through her next friend Kayla Diaz, is the minor daughter of SPC Diaz. She is a U.S. national.

425.    Plaintiff Frances Diaz is the mother of SPC Diaz and a U.S. national.

426.    Plaintiff Maximo Diaz is the father of SPC Diaz and a U.S. national.

427.    Plaintiff Anthony Diaz is the brother of SPC Diaz and a U.S. national.

428.    Plaintiff Matthew Diaz is the brother of SPC Diaz and a U.S. national.

429.    As a result of the August 12, 2014 Attack and SPC Diaz's injuries, each member of the Diaz Family has experienced severe mental anguish, emotional pain and suffering.

### T. November 24, 2014 IED Attack in Kabul (Joseph Riley Family)

430.   On November 24, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban, acting together as the Kabul Attack Network, committed a vehicle-borne IED attack in Kabul Province, Afghanistan (the "November 24, 2014 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the November 24, 2014 Attack.

431.   The November 24, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

432.   **Specialist Joseph Riley** served in Afghanistan as a member of the U.S. Army. SPC Riley was injured in the November 24, 2014 Attack. SPC Riley died on November 24, 2014 as a result of injuries sustained during the November 24, 2014 Attack.

433.   SPC Riley was a U.S. national at the time of the attack and his death.

434.   Plaintiff Michelle Riley is the mother of SPC Riley and a U.S. national.

435.   Plaintiff Rodney Riley is the father of SPC Riley and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Riley's estate.

436.   As a result of the November 24, 2014 Attack and SPC Riley's injuries and death, each member of the Riley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Riley's society, companionship, and counsel.

437.   As a result of the November 24, 2014 Attack, SPC Riley was injured in his person and/or property. The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

### U. December 12, 2014 IED Attack in Parwan (Wyatt Martin Family)

438.     On December 12, 2014, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a command wire-detonated IED attack in Parwan Province, Afghanistan (the "December 12, 2014 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the December 12, 2014 Attack.

439.     The December 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

440.     **Specialist Wyatt Martin** served in Afghanistan as a member of the U.S. Army. SPC Martin was injured in the December 12, 2014 Attack. SPC Martin died on December 12, 2014 as a result of injuries sustained during the December 12, 2014 Attack.

441.     SPC Martin was a U.S. national at the time of the attack and his death.

442.     Plaintiff Julie Martin is the mother of SPC Martin and a U.S. national.

443.     Plaintiff Brian Martin is the father of SPC Martin and a U.S. national. He brings claims in both his personal capacity and his representative capacity on behalf of SPC Martin's estate.

444.     Plaintiff Catherine Martin is the sister of SPC Martin and a U.S. national.

445.     Plaintiff Elizabeth Martin is the sister of SPC Martin and a U.S. national.

446.     As a result of the December 12, 2014 Attack and SPC Martin's injuries and death, each member of the Martin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Martin's society, companionship, and counsel.

447.     As a result of the December 12, 2014 Attack, SPC Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

### V.   August 22, 2015 Suicide Attack in Kabul (Corey Dodge, Richard McEvoy, and Barry Sutton Families)

448.     On August 22, 2015, a joint cell comprised of an FTO, al-Qaeda, and the Taliban, acting together as the Kabul Attack Network, committed a suicide bombing attack in Kabul Province, Afghanistan (the "August 22, 2015 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the August 22, 2015 Attack.

449.     The August 22, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

450.     **Corey Dodge** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone. Mr. Dodge was injured in the August 22, 2015 Attack. Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

451.     Mr. Dodge was a U.S. national at the time of the attack and his death.

452.     Plaintiff Kelli-Jo Dodge is the widow of Mr. Dodge and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Dodge's estate.

453.     Plaintiff B.D., by and through his next friend Kelli-Jo Dodge, is the minor son of Mr. Dodge. He is a U.S. national.

454.    Plaintiff P.D., by and through her next friend Kelli-Jo Dodge, is the minor daughter of Mr. Dodge. She is a U.S. national.

455.    As a result of the August 22, 2015 Attack and Mr. Dodge's injuries and death, each member of the Dodge Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Dodge's society, companionship, and counsel.

456.    As a result of the August 22, 2015 Attack, Mr. Dodge was injured in his person and/or property. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

457.    **Richard McEvoy** worked in Afghanistan as a civilian government contractor working for DynCorp, Int'l. Mr. McEvoy was injured in the August 22, 2015 Attack. Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

458.    Mr. McEvoy was a U.S. national at the time of the attack and his death.

459.    Plaintiff Kathleen McEvoy is the widow of Mr. McEvoy and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. McEvoy's estate.

460.    Plaintiff Patrick McEvoy is the son of Mr. McEvoy and a U.S. national.

461.    Plaintiff Michelle McEvoy is the daughter of Mr. McEvoy and a U.S. national.

462.    Plaintiff Janice Proctor is the mother of Mr. McEvoy and a U.S. national.

463.    Plaintiff Luann Varney is the sister of Mr. McEvoy and a U.S. national.

464.    As a result of the August 22, 2015 Attack and Mr. McEvoy's injuries and death, each member of the McEvoy Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. McEvoy's society, companionship, and counsel.

465.     As a result of the August 22, 2015 Attack, Mr. McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

466.     **Barry Sutton** worked in Afghanistan as a civilian government contractor working for DynCorp Free Zone. Mr. Sutton was injured in the August 22, 2015 Attack. Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the August 22, 2015 Attack.

467.     Mr. Sutton was a U.S. national at the time of the attack and his death.

468.     Plaintiff Summer Sutton is the daughter of Mr. Sutton and a U.S. national. She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Sutton's estate.

469.     Plaintiff Erin Goss is the daughter of Mr. Sutton and a U.S. national.

470.     Plaintiff Harriet Sutton is the mother of Mr. Sutton and a U.S. national.

471.     Plaintiff Wendy Shedd is the sister of Mr. Sutton and a U.S. national.

472.     Plaintiff Trecia Hood is the sister of Mr. Sutton and a U.S. national.

473.     Plaintiff Freddie Sutton is the brother of Mr. Sutton and a U.S. national.

474.     As a result of the August 22, 2015 Attack and Mr. Sutton's injuries and death, each member of the Sutton Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Sutton's society, companionship, and counsel.

475.     As a result of the August 22, 2015 Attack, Mr. Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

### W. December 21, 2015 Suicide Attack in Parwan (Chester McBride III Family)

476.     On December 21, 2015, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a suicide bombing attack in Parwan Province, Afghanistan (the "December 21, 2015

Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical aid to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the December 21, 2015 Attack.

477.    The December 21, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

478.    **Staff Sergeant Chester McBride III** served in Afghanistan as a member of the U.S. Air Force. SSgt McBride was injured in the December 21, 2015 Attack. SSgt McBride died on December 21, 2015 as a result of injuries sustained during the December 21, 2015 Attack.

479.    SSgt McBride was a U.S. national at the time of the attack and his death.

480.    Plaintiff Annie McBride is the mother of SSgt McBride and a U.S. national.

481.    Plaintiff Chester McBride Sr. is the father of SSgt McBride and a U.S. national.

482.    As a result of the December 21, 2015 Attack and SSgt McBride's injuries and death, each member of the McBride Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSgt McBride's society, companionship, and counsel.

483.    As a result of the December 21, 2015 Attack, SSgt McBride was injured in his person and/or property. The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

### X.  January 5, 2016 Complex Attack in Helmand (Matthew McClintock Family)

484.    On January 5, 2016, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed a complex attack involving small arms fire in Helmand Province, Afghanistan (the "January 5, 2016 Attack"), which was facilitated by the IRGC's provision of funding, weapons,

training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the January 5, 2016 Attack.

485.    The January 5, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

486.    **Sergeant First Class Matthew McClintock** served in Afghanistan as a member of the U.S. Army National Guard. SFC McClintock was injured in the January 5, 2016 Attack. SFC McClintock died on January 5, 2016 as a result of injuries sustained during the January 5, 2016 Attack.

487.    SFC McClintock was a U.S. national at the time of the attack and his death.

488.    Plaintiff Alexandra McClintock is the widow of SFC McClintock and a U.S. national.

489.    Plaintiff D.M., by and through his next friend Alexandra McClintock, is the minor son of SFC McClintock. He is a U.S. national.

490.    Plaintiff Joyce Paulsen is the mother of SFC McClintock and a U.S. national.

491.    Plaintiff George McClintock III is the father of SFC McClintock and a U.S. national.

492.    As a result of the January 5, 2016 Attack and SFC McClintock's injuries and death, each member of the McClintock Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC McClintock's society, companionship, and counsel.

493.    As a result of the January 5, 2016 Attack, SFC McClintock was injured in his person and/or property. The Plaintiff members of the McClintock Family are the survivors and/or heirs of SFC McClintock and are entitled to recover for the damages SFC McClintock sustained.

**Y. August 7, 2016 Kidnapping, Subsequent Hostage Taking, And Torture in Kabul and Pakistan (Kevin King Family)**

494.    On August 7, 2016, a joint cell comprised of FTOs, al-Qaeda and the Haqqani Network, acting together as the Kabul Attack Network, committed a kidnapping at gunpoint in Kabul Province, Afghanistan (the "King Kidnapping Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the King Kidnapping Attack.

495.    The King Kidnapping Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

496.    **Kevin King** served in Afghanistan as a civilian professor teaching at American University of Afghanistan. On August 7, 2016, Mr. King was injured in a kidnapping at gunpoint attack in Kabul Province, and he was held hostage for years thereafter. The King Kidnapping Attack severely wounded Mr. King, who was tortured, beaten, malnourished, and experienced a broad range of life-altering ailments thereafter, which injuries were caused by the repeated torture and beatings Mr. King sustained at the hands of Sirajuddin Haqqani's personal terrorist henchmen from the Haqqani Network. As a result of the King Kidnapping Attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering.

497.    Plaintiff King was a U.S. national at the time of the kidnapping and remains one to this day.

498.    Plaintiff Stephanie Miller is the sister of Mr. King and a U.S. national.

499.    As a result of the King Kidnapping Attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

### Z.  July 3, 2017 Indirect Fire Attack in Helmand (Hansen Kirkpatrick Family)

500.    On July 3, 2017, a joint cell comprised of an FTO, al-Qaeda, and the Taliban committed an indirect fire attack in Helmand, Afghanistan (the "July 3, 2017 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the July 3, 2017 Attack.

501.    The July 3, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

502.    **Private First Class Hansen Kirkpatrick** served in Afghanistan as a member of the U.S. Army. PFC Kirkpatrick was injured in the July 3, 2017 Attack. PFC Kirkpatrick died on July 3, 2017 as a result of injuries sustained during the July 3, 2017 Attack.

503.    PFC Kirkpatrick was a U.S. national at the time of the attack and his death.

504.    Plaintiff Anngel Norkist is the mother of PFC Kirkpatrick and a U.S. national.

505.    Plaintiff William Newnham is the stepfather of PFC Kirkpatrick and a U.S. national. Mr. Newnham lived in the same household as PFC Kirkpatrick for a substantial period and considered PFC Kirkpatrick the functional equivalent of a biological son.

506.    Plaintiff Hart Norkist is the brother of PFC Kirkpatrick and a U.S. national.

507.    Plaintiff Aujza Norkist is the sister of PFC Kirkpatrick and a U.S. national.

508.    As a result of the July 3, 2017 Attack and PFC Kirkpatrick's injuries and death, each member of the Kirkpatrick Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kirkpatrick's society, companionship, and counsel.

509.    As a result of the July 3, 2017 Attack, PFC Kirkpatrick was injured in his person and/or property. The Plaintiff members of the Kirkpatrick Family are the survivors and/or heirs of PFC Kirkpatrick and are entitled to recover for the damages PFC Kirkpatrick sustained.

### AA.    January 14, 2019 Suicide Attack in Kabul (Manoharan Kamaleson Family)

510.    On January 14, 2019, a joint cell comprised of an FTO, al-Qaeda, and the Taliban,, acting together as the Kabul Attack Network, committed a suicide bombing attack in Kabul, Afghanistan (the "January 14, 2019 Attack"), which was facilitated by the IRGC's provision of funding, weapons, training, and logistical support to al-Qaeda and the Taliban. Al-Qaeda planned and authorized the January 14, 2019 Attack.

511.    The January 14, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

512.    **Mr. Manoharan P. Kamaleson** worked in Afghanistan as a civilian chief operating officer with First MicroFinance Bank. Mr. Kamaleson was injured in the January 14, 2019 Attack. Mr. Kamaleson died on January 14, 2019 as a result of injuries sustained during the January 14, 2019 Attack.

513.    Mr. Kamaleson was a U.S. national at the time of the attack and his death.

514.    Plaintiff Nicole Kamaleson is the widow of Mr. Kamaleson and a U.S. national.

515.    Plaintiff Cedric Kamaleson is the son of Mr. Kamaleson and a U.S. national.

516.    Plaintiff Barclay Kamaleson is the son of Mr. Kamaleson and a U.S. national.

517.    Plaintiff Cade Kamaleson is the son of Mr. Kamaleson and a U.S. national.

518.    Plaintiff Sunderraj Kamaleson is the brother of Mr. Kamaleson and a U.S. national.

519.     As a result of the January 14, 2019 Attack and Mr. Kamaleson's injuries and death, each member of the Kamaleson Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Kamaleson's society, companionship, and counsel.

520.     As a result of the January 14, 2019 Attack, Mr. Kamaleson was injured in his person and/or property. The Plaintiff members of the Kamaleson Family are the survivors and/or heirs of Mr. Kamaleson and are entitled to recover for the damages Mr. Kamaleson sustained.

## VI.     THE IRGC'S TERRORIST PROXIES COMMITTED, PLANNED, AND AUTHORIZED THE ATTACK THAT INJURED PLAINTIFF MATTHEW SCHRIER IN SYRIA

521.     The IRGC used its resources to provide al-Qaeda, al-Qaeda-in-Iraq, and al-Nusra Front funds, operational support, logistical support, communications technology, and safe haven, which raised money for their shared terrorist enterprise against America. Al-Qaeda, al-Qaeda-in-Iraq, and al-Nusra Front, used these resources to commit the attacks that injured Plaintiff Matthew Schrier.

522.     Plaintiff Matthew Schrier was an American photojournalist who was injured in a hostage-taking attack committed by al-Nusra Front that was funded, armed, and logistically supported by the IRGC, the IRGC-QF.

523.     On December 31, 2012, al-Nusra Front kidnapped Mr. Schrier in Aleppo, Syria. ANF held Mr. Schrier hostage for 211 days, during which ANF tortured him, before he escaped to his freedom on July 29, 2013. Al-Qaeda and al-Qaeda-in-Iraq planned and authorized ANF's attack against Mr. Schrier.

524.     As part of its attack against Mr. Schrier, ANF terrorists used Mr. Schrier's debt card(s) to debit substantial amounts, nearly $20,000 (without considerations of interest), from Mr. Schrier's bank accounts inside the United States to buy equipment for ANF to support the

group's terrorist attacks, which injured Mr. Schrier by, *inter alia*, stealing his property, harming his mental health and quality of life, and imposing substantial economic harm upon him.

525.     Mr. Schrier's kidnapping, subsequent confinement, and torture would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the terrorists kidnapped and murdered an unarmed civilian who was not engaged in hostilities.

526.     Mr. Schrier was a U.S. national throughout the attack and remains one today.

527.     As a result of his kidnapping and torture, Mr. Schrier has experienced severe mental anguish, emotional pain and suffering, and was injured in his person and/or property.

**CLAIMS FOR RELIEF**

**COUNT ONE: AIDING AND ABETTING UNDER THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2)**

528.     Plaintiffs incorporate their factual allegations above.

529.     To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that Defendants were generally aware that they were playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that Defendants knowingly provided substantial assistance.

530.     Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

531.    The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

(a)  the attacks involved violent and dangerous acts that violate the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively;

(b)  the attacks, carried out by terrorists bent on expelling the United States and its allies from Afghanistan and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (ii) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping;

(c)  the attacks occurred primarily outside the territorial jurisdiction of the United States, in Afghanistan and Syria.

532.   Each attack was committed, planned, or authorized by one or more FTOs. Many attacks were committed directly by the FTOs al-Qaeda, the Haqqani Network, al-Qaeda-in-Iraq, and al-Nusra Front, as alleged *supra*.

533.   Every attack, regardless of who committed it, was planned or authorized by al-Qaeda, al-Qaeda-in-Iraq, and/or al-Nusra Front, each of which was always an FTO.

534.   Defendants were generally aware that they were playing a role in illegal activity, and that the terrorist attacks that injured Plaintiffs were a natural and foreseeable consequence of that activity. *See supra* Part II.

535.   Defendants provided assistance knowingly, and not innocently or inadvertently. *See supra* ¶ 160. They did so with knowledge that they were aiding terrorist organizations carrying out attacks on Americans. *See supra* Part II.B.

536.   Defendants' assistance was substantial. *See supra* Part III.

537.   Defendants' assistance was pervasive and systemic, involving the highest levels of Halkbank's management, years of willful misconduct, and tremendous sums of money that provided critically important assistance to the IRGC and its terrorist proxies.

538.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO: CONSPIRACY UNDER THE ANTI-TERRORISM ACT,**
**18 U.S.C. § 2333(d)(2)**

539.   The IRGC sits in the center of a global hub-and-spoke conspiracy, the object of which is to advance the IRGC's foreign policy agenda. That object includes inflicting casualties on Americans to force the United States to withdraw from the Middle East.

540.    The IRGC's terrorist proxies, including al-Qaeda, the Taliban (including its Haqqani Network), al-Qaeda-in-Iraq, and al-Nusra Front, are members of this conspiracy that act to pursue the IRGC's goal of inflicting casualties on Americans.

541.    Defendants agreed to join and support the IRGC's worldwide campaign of anti-American terrorism by agreeing to facilitate the IRGC's access to NIOC's oil revenues that were blocked by U.S. anti-terrorism sanctions. By doing so, Defendants agreed to assist the IRGC in obtaining resources to pursue its foreign policy goals.

542.    Defendants knew that they were agreeing to assist the IRGC because they had direct contact with IRGC officials when designing and executing their scheme. Defendants expressly informed those individuals of their desire to participate in the conspiracy—for example when Zarrab expressed his willingness to assist in "economic Jihad," and when Balkan described himself to an IRGC general as an "inside man" ready to assist the IRGC.

543.    Defendants knew that the IRGC's foreign policy goals included a worldwide campaign of anti-American terrorism because myriad public sources—including statements by governments, international organizations, and subject-matter experts—had established that fact.

544.    Defendants never voluntarily withdrew from the conspiracy, which remains ongoing.

545.    As co-conspirators, Defendants are liable for all damages caused by acts in furtherance of the conspiracy they joined, and by the foreseeable consequences of the conspiracy.

546.    The terrorist attacks that injured Plaintiffs were acts in furtherance of the conspiracy because:

    (i) each one was a criminal act undertaken by a member of the conspiracy in order to advance the IRGC's foreign policy agenda, including its objective of inflicting casualties on Americans to drive the United States out of the Middle East;

    (ii) each attack helped the IRGC sustain its primacy within Iran by establishing its effectiveness as a terrorist actor. This, in turn, allowed the IRGC to maintain its control over entities like NIOC, which inured to the benefit of the IRGC and Defendants by allowing them to continue their profitable illicit relationship.

547.    The attacks were also foreseeable consequences of the conspiracy Defendants joined because the conspiracy's known objectives and methods included terrorist attacks by the IRGC's proxies on Americans in Afghanistan and Syria. Thus, any person who agreed to support the IRGC's foreign policy agenda, including by providing access to funds to carry it out, knew or should have known that this support would contribute to terrorist attacks on Americans.

## JURY DEMAND

548.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

549.    Plaintiffs request that the Court:

(a)    Enter judgment against Defendants finding them jointly and severally liable for aiding and abetting under JASTA, 18 U.S.C. § 2333(d)(2);

(b)    Enter judgment against Defendants finding them jointly and severally liable for conspiracy under JASTA, 18 U.S.C. § 2333(d)(2);

(c)    Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages pursuant to 18 U.S.C. § 2333(a);

(d)     Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18

U.S.C. § 2333(a);

(e)     Award Plaintiffs prejudgment interest; and

(f)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated: July 26, 2023

s/Tejinder Singh

Tejinder Singh (TS0613)
Adam J. Goldstein (AG0318)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com

*Counsel for Plaintiffs*